**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BERNARD BERGER,** | ) | |
| **CRAIG JOHNSON,** | ) | FILED:  JULY 16,  20008 |
| **GREGORY CAHILLANE, and** | ) | 08CV4023 |
| **ALBERTINE CONNELL,** | ) | JUDGE CONLON |
| | ) | MAGISTRATE JUDGE ASHMAN |
| **Plaintiff,** | ) **NO.** | |
| | ) | RP |
| **v.** | ) | |
| | ) | |
| **THE ART INSTITUTE OF CHICAGO,** | ) | |
| **an Illinois Not-For-Profit Corporation,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

**COMPLAINT**

NOW COME the Plaintiffs Bernard Berger, Craig Johnson, Gregory Cahillane, and

Albertine Connell, by and through their attorneys, Law Office of John Bishof, PC, and for their

Complaint against the Defendant, The Art Institute of Chicago, state unto this Honorable Court

as follows:

**JURISDICTION AND VENUE**

1.    This is a civil action arising under the laws of the United States in which Counts I, II, III, V,

and VII are brought pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §1140 ("ERISA Sec. 510") and Counts IV, VI, and VIII are brought

pursuant to the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §

623(a)(1), to correct unlawful employment practices, and to provide appropriate relief to

employees who were adversely affected by such practices.

2.    This Court has jurisdiction of the claims pursuant to 28 U.S.C. § 1331, 1343; and 29 U.S.C.

§§ 1132(e)(1), 1132(f) for Counts I, II, III, V, and VII; and 29 U.S.C. §216(b) as incorporated

in 29 U.S.C. §626 for Counts IV, VI, and VIII.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) for all counts and 29 U.S.C.

§1132(e)(2) for Counts I, II, III, V, and VII.

4.     The employment practices hereafter alleged to be unlawful were being committed within the

jurisdiction of the United States District Court for the Northern District of Illinois, Eastern

Division.

**PARTIES**

5.     Plaintiff, Bernard Berger, is now and at all times relevant hereto, a citizen of the state of

Illinois, and resident of this District in the county of Cook.

6.     Plaintiff, Craig Johnson, is now, and at all time relevant hereto, a citizen of the state of

Illinois, and resident of the Western District of the Northern District of Illinois in the county

of McHenry.

7.     Plaintiff, Gregory Cahillane, is now a citizen of the state of Michigan and resident of the city

of Eastpointe, county of Macomb, and at the time of his termination was a citizen of the state

of Illinois, and resident of the city of Chicago, county of Cook.

8.     Plaintiff, Albertine Connell, is now and at all times relevant hereto, a citizen of the state of

Illinois, and resident of this District in the county of Cook.

9.     Defendant, The Art Institute of Chicago, (hereinafter referred to as "AIC") is now and was

at all times herein mentioned, a non-profit corporation duly organized and existing according

to law engaged in an industry affecting commerce in this district.  The AIC's principal place

of business is located in Illinois. The AIC at all relevant times, founds, builds, maintains, and

operates museums, schools, libraries of art and theaters, and support facilities in connection

therewith, in counties of this District to include the county of Cook.

10.    For purposes of Counts I, II, III, V, and VII, the AIC is and was at all time relevant hereto an employer under 29 U.S.C. § 1002(5).

11.    For purposes of Counts IV, VI and VIII, the AIC is and was at all times relevant hereto an employer under 29 U.S.C. §630(b).

12.    At all times relevant hereto, Plaintiff, Bernard Berger, was employed by Defendant, AIC, as a Fire Protection Specialist within the Department of Protection Services ("DOPS") until his involuntary termination.  Plaintiff was an "employee" within the meaning of ERISA, 29 U.S.C. §1002(6), and a "participant' in and/or "beneficiary" of one or more employee benefit plans covered by ERISA, 29 U.S.C. §1002(7) & (8).

13.    At all times relevant hereto, Plaintiffs, Craig Johnson, Gregory Cahillane, and Albertine Connell, were employed by Defendant, AIC, as Security Managers within the DOPS, until their involuntary terminations. These Plaintiffs were "employee[s]" within the meaning of ERISA, 29 U.S.C. §1002(6), and "participant[s]" in and/or "beneficiar[ies]" of one or more employee benefit plans covered by ERISA, 29 U.S.C. §1002(7) & (8). These Plaintiffs also were "employee[s]" within the meaning of the ADEA, 29 U.S.C. §630(f).

## FACTS COMMON TO ALL PLAINTIFFS

14.    Plaintiffs began their employment with Defendant, AIC, as part of the Protection Services division between 1977 and 1987.

15.    Plaintiffs excelled each year, perfected their crafts, earned promotions and excellent performance reviews until 2002.

16.    In 2002, a new management team and style was initiated at the AIC, which greatly affected

3

employee benefits and the management of the DOPS.

17.    In 2004, multiple changes were made by the new AIC Administration regarding employees'

benefits.  These changes include instituting a policy that no severance benefit would be paid

if the employee was terminated with "cause" and increasing the retirement age for pension

purposes from sixty-two(62)  to sixty-five (65) years of age.

18.    From 2002 through 2004, plaintiffs received performance reviews of "meeting expectations"

or above "meeting expectations".

19.    In 2004 and 2005, plaintiffs positions were altered by either promotions or change of

departments.

20.    Due to plaintiffs' years served at AIC, all in excess of nineteen years at time of termination,

they stood to receive substantial pension benefits in  the following ten years upon their

retirement at the age of sixty-five or older.

21.    Starting in November 2005, within a span of ten months, Defendant, AIC, terminated the

employment of all plaintiffs.

**COUNT I**
**VIOLATION OF SECTION 510 OF ERISA**
**EMPLOYEE PENSION PLAN**

1-21.  Plaintiff, Bernard Berger, reaffirms and realleges the allegations contained in Paragraph 1

through 21 above, and states further in this Count I.

22.    Plaintiff, Bernard Berger, began his employment with Defendant, AIC, on November 1,

1977.

23.    At all relevant times, Plaintiff, Bernard Berger, was qualified for his position as Fire

Protection Specialist.

24.    From 1977 to 2002, Plaintiff excelled each year, perfected his craft, and earned excellent
performance reviews.

25.    Although Plaintiff's performance was satisfactory, on November 8, 2004, Plaintiff, Berger,
was placed on a ninety (90) day Performance Improvement Plan (PIP), which was extended
thirty (30) days on February 9, 2005.  However, in April 2005, Plaintiff, Berger, was orally
informed by his supervisor, Margaret Skimina, that his job was no longer in jeopardy.

26.    On August 3, 2005, Plaintiff, Berger, received a new job description and was transferred
from the Physical Plant Department to the OSHA compliance office.

27.    Then on September 26, 2005, Plaintiff, Berger, received a memorandum from his supervisor,
Skimina, referencing the November 2004 PIP and stating that Plaintiff had not fulfilled the
2004 PIP.  Plaintiff avers that this memorandum was in direct conflict with the oral
confirmation that his job was no longer in jeopardy and was irrelevant due to Plaintiff's new
job description and placement.

28.    On November 4, 2005, Plaintiff, Berger, met with his supervisor, Skimina, at which time he
was terminated.  At the meeting he received a memorandum addressed to Jevoid Simmons,
AIC Manager of Employee Relations, from Skimina dated October 31, 2005 in which
Skimina recommended terminating Berger's employment and referenced the expired 2004
PIP.

29.    AIC alleges that Berger was terminated for cause on November 4, 2005 based on substandard
performance, however, Plaintiff had not been formally evaluated or received an annual
evaluation since September 2004, over a year prior to his termination.

30.    Plaintiff, Berger, avers that his involuntary termination allegedly "for cause" was pre-textual and intentionally designed to prevent him from exercising his rights to further benefits under the AIC Pension Plan.

31.    At all times material hereto, AIC maintained the Art Institute of Chicago Pension Plan ("AIC Pension Plan").

32.    Upon information and belief, the AIC Pension Plan is an ERISA qualified employee pension benefit plan as defined by 29 U.S.C. §1002(2)(A).

33.    The AIC Pension Plan provides participants with a monthly pension benefit upon retirement that continues over the remainder of the participant's lifetime and over the participant's surviving spouse's lifetime.  (Attached as "Exhibit A", AIC Pension Plan Summary).

34.    Plaintiff, Berger, is a plan participant within the meaning of the AIC Pension Plan.

35.    At all times material hereto Berger satisfied all conditions precedent to vesting and awarding of post-termination benefits under the AIC Pension Plan.

36.    Pursuant to the AIC Pension Plan, on November 1, 1982, with five years of service, Berger became vested in his pension benefits.

37.    On November 4, 2005, Defendant, AIC, discharged Plaintiff, Berger, for the purpose of interfering with his attainment of "normal retirement pension" benefits, as described in the AIC Pension Plan Summary. (Exhibit A, 7).

38.    Plaintiff, Berger, was employed by AIC in excess of twenty years and maintained satisfactory or better performance records prior to his termination.

39.    Due to Defendant, AIC, terminating Plaintiff's employment, Berger was forced to elect the early retirement pension, and suffered a major deduction in his monthly pension benefits as

Plaintiff was not anticipating retiring until May 1, 2012, at the age of sixty-five (65).

40.    Plaintiff, Berger, avers that his involuntary termination allegedly "for cause" was pre-textual and intentionally designed to prevent him from exercising his rights to further benefits under the AIC Pension Plan.

41.    On or about July 6, 2006, Plaintiff, Berger, was granted his reduced, early retirement pension benefit.

42.    As a direct and proximate result of Defendant's violation of ERISA section 510, Plaintiff has lost and will continue to lose income, including but not limited to, wages, salary increases, medical and dental insurance, pension benefits and other employment benefits. Plaintiff has also suffered disruption of his personal life and damage to his employment reputation.

   **WHEREFORE**, Plaintiff, Bernard Berger, respectfully prays that this Court enter judgment in his favor and against Defendant, AIC, as follows:

   a.    That a finding be entered that AIC intentionally discriminated against, and terminated, Bernard Berger in violation of ERISA section 510, 29 U.S.C. §1140;

   b.    That Bernard Berger's employment be reinstated as of and retroactive to November 4, 2005 and that such employment be continued up through the earlier of (a) the date an appropriate order issues from this Court; or (b) the day preceding the commencement of any succeeding comparable employment secured by Plaintiff either prior or during the pendency of this action.

   c.    That Bernard Berger be retroactively awarded all backpay including all benefits to which he would have been entitled or for which he would have attained an interest or accrual, in order to be "made whole" but for Defendant, AIC, terminating his

employment, from the date of termination until such time as judgment in this cause is rendered. Such order shall allow Plaintiff to be reimbursed for additional health premiums paid by Plaintiff due to COBRA enrollment, Retire Health enrollment, and related higher health care continuation rates;

d.    That the Court order the Defendant to pay Plaintiff prejudgment interest on all backpay, compensation and benefits awarded under Paragraph c that have accrued prior the date of judgment;

e.    That, in the alternative to reinstatement of employment and actual attainment of a full vested pension benefit under the Plan, the Court order the Defendant, AIC, to pay Bernard Berger front pay including all benefits to which he would have been entitled or for which he would have attained an interest or accrual, in order to be "made whole" but for Defendant terminating his employment. Such order shall allow Plaintiff, Berger, to receive the benefit of employer-provided health insurance at active employee rates and be reimbursed for additional health premiums paid by Plaintiff due to COBRA enrollment, Retire Health enrollment, and related higher health care continuation rates.

f.    That, in the alternative to reinstatement of employment and actual attainment of a full vested pension benefit under the Plan, the Court order the Defendant, AIC, to pay Bernard Berger a lump-sum cash equivalent amount that, after-tax, represents the actuarial equivalent of the full vested pension benefit that Plaintiff would have fully accrued as of the late of (a) May 1, 2012 or (b) the date through which any Court-ordered front pay award must be made, under the Plan but for the Defendant

terminating Plaintiff's employment; such payment being a restitutionary equitable remedy available under ERISA;

g.    That Bernard Berger be awarded his costs of maintaining this action, including but not limited to, reasonable attorneys' fees, pursuant to 29 U.S.C. §1132(g)(1); and

h.    That Bernard Berger be awarded such other and further relief as this Court deems necessary to effectuate the purposes of ERISA.

**COUNT II**
**VIOLATION OF SECTION 510 OF ERISA**
**EMPLOYEE WELFARE BENEFIT PLAN**

1-42.  Plaintiff, Bernard Berger, reaffirms and realleges the allegations contained in Paragraph 1 through 42 of Count I as in this Count II.

43.    At all times material hereto, AIC maintained the Art Institute of Chicago Medical and Dental Plan ("AIC Medical and Dental Plan").

44.    Upon information and belief, the AIC Medical and Dental Plan is an ERISA qualified employee welfare benefit plan as defined by 29 U.S.C §1002(1).

45.    The AIC Medical and Dental Plan provides participants with medical and dental insurance coverage in addition to other employee benefits.  (Employee Guidelines that referred to AIC Medical and Dental Plan attached as "Exhibit B").

46.    At all times material hereto, Plaintiff, Berger, was a plan participant within the meaning of the AIC Medical and Dental Plan.

47.    At all times material hereto, Plaintiff, Bernard Berger, his wife, Susan Berger, and his son, Matthew Berger, received medical and dental benefits under the AIC Medical and Dental Plan which included Cigna medical insurance.

9

48.   In 2004, Cigna, pursuant to the AIC Medical and Dental Plan, covered over $100,000 of medical expenses for treatment of Plaintiff's wife, Susan Berger.

49.   From September 2002 through September 2003, Cigna, pursuant to the AIC Health and Dental plan, covered over $53,000 of medical expenses for treatment of Plaintiff's son, Matthew Berger.

50.   Plaintiff, Berger, avers that his involuntary termination allegedly "for cause" was pre-textual and intentionally designed to prevent him from exercising his rights to further benefits under the AIC Medical and Dental Plan.

51.   Due to Defendant terminating Plaintiff's employment, Plaintiff was forced into an expensive COBRA insurance policy for himself and he had to obtain lesser third party insurance coverage at a higher cost for his wife and son.

52.   As a direct and proximate result of Defendant's violation of ERISA, Plaintiff has lost and will continue to lose income, including, but not limited to wages, salary increase, medical and dental insurance for himself and his dependents, pension benefits and other employment benefits. Plaintiff has also suffered disruption of his personal life and damage to his employment reputation.

   **WHEREFORE**, Plaintiff, Bernard Berger, respectfully prays that this Court enter judgment in his favor and against Defendant, AIC, as follows:

   a.   That a finding be entered that AIC intentionally discriminated against, and terminated, Bernard Berger in violation of ERISA section 510, 29 U.S.C. §1140;

   b.   That Bernard Berger's employment be reinstated as of and retroactive to November 4, 2005 and that such employment be continued up through the earlier of (a) the date

an appropriate order issues from this Court; or (b) the day preceding the commencement of any succeeding comparable employment secured by Plaintiff either prior or during the pendency of this action.

c.      That Bernard Berger be retroactively awarded all backpay including all benefits to which he would have been entitled or for which he would have attained an interest or accrual, in order to be "made whole" but for Defendant, AIC, terminating his employment, from the date of termination until such time as judgment in this cause is rendered.  Such order shall allow Plaintiff to be reimbursed for additional health premiums paid by Plaintiff due to COBRA enrollment, Retire Health enrollment, and related higher health care continuation rates;

d.      That the Court order the Defendant to pay Plaintiff prejudgment interest on all backpay, compensation and benefits awarded under Paragraph c that have accrued prior the date of judgment;

e.      That, in the alternative to reinstatement of employment and actual attainment of a full vested pension benefit under the Plan, the Court order the Defendant, AIC, to pay Bernard Berger front pay including all benefits to which he would have been entitled or for which he would have attained an interest or accrual, in order to be "made whole" but for Defendant terminating his employment. Such order shall allow Plaintiff, Berger, to receive the benefit of employer-provided health insurance at active employee rates and be reimbursed for additional health premiums paid by Plaintiff due to COBRA enrollment, Retire Health enrollment, and related higher health care continuation rates.

11

f.   That Bernard Berger be awarded his costs of maintaining this action, including but not limited to, reasonable attorneys' fees, pursuant to 29 U.S.C. §1132(g)(1); and

g.   That Bernard Berger be awarded such other and further relief as this Court deems necessary to effectuate the purposes of ERISA.

## COUNT III
## CRAIG JOHNSON
## VIOLATION OF SECTION 510 OF ERISA

1-21.   Plaintiff, Craig Johnson, reaffirms and realleges the allegations contained in paragraphs 1 through 21 above as paragraphs 1 through 21 in this Count III.

22.   Plaintiff, Craig Johnson, began his employment with defendant, AIC, on February 17, 1987, as a Security Supervisor in the DOPS.

23.   Plaintiff maintained excellent, exceeding expectations performance reviews from 1987 through 2002.

24.   In 2004, the new management team restructured the DOPS, and Plaintiff, Craig Johnson, was "promoted" from a hourly position to a salaried, Fair Labor Standards Act exempt, position, with a modest increase to his salary and a significant increase of expectations placed upon Plaintiff.

25.   Upon information and belief, between 2005 and 2006, Plaintiff's Supervisors were told by the AIC Associate Director of Museum Operations to terminate the employment of Plaintiff in addition to two of Plaintiff's co-workers, Cahillane and Connell.

26.   At all relevant times, plaintiff, Craig Johnson, was qualified for his position as Security Manager

27.   AIC alleges that Craig Johnson was terminated for cause on September 15, 2006 based on

12

a decision made by Johnson to not report an incident that occurred September 11, 2006 in which two AIC workers, one an AIC employee and the other a contractor, had a disagreement and the AIC employee "threatened" the contractor. The threatened contractor reported the disagreement but not the threat to Johnson. Additionally, the contractor reported the threat to his direct supervisor who contacted human resources. The contractor was not a member of the staff plaintiff managed and plaintiff's job description does not list reporting of employee disputes as a job duty. (Job description attached as "Exhibit C").

28.   Furthermore, the following day, September 12, 2006, plaintiff's relatively new supervisor, Monique Tarleton, questioned Plaintiff regarding the incident in which Plaintiff stated that the direct supervisor of contractors was the proper person to handle the incident, as had been the procedure during his twenty years at the AIC. This did not satisfy Ms. Tarleton and she reported the matter to the Associate Director of Museum Operations, the same individual who upon information and belief, told plaintiff's supervisors to terminate plaintiff's employment.

29.   Plaintiff, Craig Johnson, avers that his involuntary termination on September 15, 2006, allegedly "for cause" was pre-textual and intentionally designed to prevent him from exercising his rights to further benefits under the AIC Pension Plan.

30.   At all times material hereto, AIC maintained the Art Institute of Chicago Pension Plan ("AIC Pension Plan").

31.   Upon information and belief, the AIC Pension Plan is an ERISA qualified employee pension benefit plan as defined by 29 U.S.C. §1002(2)(A).

32.   The AIC Pension Plan provides participants with a monthly pension benefit upon retirement

that continues over the remainder of the participant's lifetime and over the participant's surviving spouse's lifetime. (Exhibit A).

33. Plaintiff, Craig Johnson, is a plan participant within the meaning of the AIC Pension Plan.

34. At all times material hereto Craig Johnson satisfied all conditions precedent to vesting and awarding of post-termination benefits under the AIC Pension Plan.

35. Pursuant to the AIC Pension Plan, on February 17, 1992, with five years of service, Craig Johnson became vested in his pension benefits.

36. Upon information and belief, of the twenty-seven Protection Service Managers in the DOPS, only ten, including Plaintiffs, were scheduled to receive similar pensions within the next ten years. In addition to Plaintiffs, two members of this group have been involuntarily terminated within the past three years and another is on work protected leave.

37. On September 15, 2006, Defendant, AIC, discharged Plaintiff, Craig Johnson, for the purpose of interfering with his attainment of "normal retirement pension" benefits, as described in the AIC Pension Plan Summary. (Exhibit A, 7).

38. Plaintiff, Craig Johnson, was employed by AIC in excess of nineteen years and maintained satisfactory or better performance records prior to his termination.

39. Due to defendant, AIC, terminating plaintiff's employment, Craig Johnson suffered a major deduction in his monthly pension benefits as plaintiff was not anticipating retiring until February 2014, at the age of sixty-six (66).

40. Plaintiff, Craig Johnson, avers that his involuntary termination allegedly "for cause" was pre-textual and intentionally designed to prevent him from exercising his rights to further benefits under the AIC Pension Plan.

14

41.   Plaintiff has not selected to receive his reduced pension payments at this time.

42.   As a direct and proximate result of defendant's violation of ERISA section 510, plaintiff has

lost and will continue to lose income, including but not limited to, wages, salary increases,

medical and dental insurance, pension benefits and other employment benefits.  Plaintiff has

also suffered disruption of his personal life and damage to his employment reputation.

WHEREFORE, plaintiff, Craig Johnson, respectfully prays that this Court enter judgment

in his favor and against defendant, AIC, as follows:

a.   That a finding be entered that AIC intentionally discriminated against, and

terminated, Craig Johnson in violation of ERISA section 510, 29 U.S.C. §1140;

b.   That Craig Johnson be retroactively awarded all backpay including all benefits to

which he would have been entitled or for which he would have attained an interest

or accrual, in order to be "made whole" but for Defendant, AIC, terminating his

employment, from the date of termination until such time as judgment in this cause

is rendered.  Such order shall allow Plaintiff to be reimbursed for additional health

premiums paid by Plaintiff due to COBRA enrollment and related higher health care

continuation rates;

c.   That the Court order the Defendant to pay Plaintiff prejudgment interest on all

backpay, compensation and benefits awarded under Paragraph b that have accrued

prior the date of judgment;

d.   That Craig Johnson be awarded front pay including all benefits to which he would

have been entitled or for which he would have attained an interest or accrual, in order

to be "made whole" but for Defendant terminating his employment.

15

e.      That Craig Johnson be awarded a lump-sum cash equivalent amount that, after-tax, represents the actuarial equivalent of the vested pension benefit that Plaintiff would have fully accrued as of the late of (a) February 1, 2014 or (b) the date through which any Court-ordered front pay award must be made, under the Plan but for the Defendant terminating plaintiff's employment; such payment being a restitutionary equitable remedy available under ERISA;

f.      That Craig Johnson be awarded his costs of maintaining this action, including but not limited to, reasonable attorneys' fees, pursuant to 29 U.S.C. §1132(g)(1); and

g.      That Craig Johnson be awarded such other and further relief as this Court deems necessary to effectuate the purposes of ERISA.

### COUNT IV
### CRAIG JOHNSON
### VIOLATION OF ADEA

1-42.   Plaintiff, Craig Johnson, reaffirms and realleges the allegations contained in paragraph 1 through 42 of Count III as paragraphs 1 through 40 of this Count IV.

43.     On or about October 10, 2006, Plaintiff, Craig Johnson, filed a charge of discrimination against Defendant, AIC, with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 440-2007-0016 ("Exhibit D").

44.     Plaintiff's charge of discrimination was timely filed within three hundred (300) days of the alleged unlawful employment practice; thus, Plaintiff has satisfied all administrative prerequisites.

45.     Plaintiff, Craig Johnson, received the right to sue letter from the EEOC dated April 17, 2007. Said right to sue letter is attached hereto as "Exhibit E". This case is filed within ninety (90)

days thereof.

46.     On September 15, 2006, Defendant, AIC,  terminated Plaintiff's employment based on his

        age.

47.     Plaintiff, Craig Johnson, was born on January 6, 1948 and at all relevant times, he was in

        excess of 40 years of age.

48.     Defendants' conduct in terminating plaintiff and replacing him with, upon information and

        belief, a less qualified, younger Securitas contractor who earned less wages and may not

        receive employee pension and welfare benefits, was discriminatory and in violation of

        plaintiff's rights under the Age in Discrimination in Employment Act.

49.     Upon information and belief, the unlawful discriminatory practices by Defendants, as set

        forth above, were intentional.

50.     Defendants, at all relevant times, acted with malice or reckless indifference to the federally

        protected rights of Plaintiff in violation of the Age Discrimination in Employment Act of

        1967 (ADEA), 29 U.S.C.A. § 621.

51.     That the aforesaid acts by the Defendant have intentionally discriminated against Plaintiff.

52.     As a direct and proximate result of Defendants' violation of the ADEA, Plaintiff has lost and

        will continue to lose income, including but not limited to wages, raises, insurance and other

        employment benefits.  Plaintiff has also suffered severe emotional distress and humiliation

        about the ability to support himself, as well as disruption of his personal life and damage to

        his employment reputation.

        WHEREFORE, Plaintiff, Craig Johnson, respectfully prays that judgment be entered against

Defendants for recovery of reasonable damages in an amount greater than Seventy-Five Thousand

Dollars ($75,000.00), together with interest thereon, as well as such other damages as may be proven

at the time of trial, including but not necessarily limited to, actual, consequential and punitive damages, attorneys fees and cost, and such other and further relief as this Court may deem appropriate.

## COUNT V
## GREGORY CAHILLANE
## VIOLATION OF SECTION 510 OF ERISA

1-21.    Plaintiff, Gregory Cahillane, reaffirms and realleges the allegations contained in paragraphs 1 through 21 above as paragraphs 1 through 20 of this Count V.

22.    Plaintiff, Gregory Cahillane, began his employment with defendant, AIC, on February 17, 1987, as a Security Guard in the DOPS.

23.    Plaintiff was promoted to Security Supervisor in 1991.

24.    Plaintiff maintained excellent, exceeding expectations performance reviews from 1987 through 2002.

25.    In 2004, the new management team restructured the DOPS, and Plaintiff was "promoted" from a hourly position to a salaried, Fair Labor Standards Act exempt, position, with a modest increase to his salary and a significant increase of expectations placed upon Plaintiff.

26.    Upon information and belief, between 2005 and 2006, Plaintiff's Supervisors were told by the AIC Associate Director of Museum Operations to terminate the employment of Plaintiff in addition to two of Plaintiff's co-workers, Johnson and Connell.

27.    At all relevant times, Plaintiff, Gregory Cahillane, was qualified for his position as Security Manager

28.    AIC alleges that Gregory Cahillane was terminated for cause on September 15, 2006 based on a decision made by Cahillane to remove a security guard taking an attendance count of a Senior Celebration Event to help his supervisor, Monique Tarleton at her request. At the

time Plaintiff removed the guard from her count assignment he believed the guard had fulfilled her duty and to ensure the area was covered, replaced the removed guard with another guard.  However, the count of attendees that was provided to the event coordinator was 35 guests lower than the number of tickets sold, so it was deemed inaccurate. Additionally, providing event attendance counts is not a duty listed under Plaintiff's job description. (Exhibit C).

29.    Plaintiff, Gregory Cahillane, avers that his involuntary termination on September 15, 2006, allegedly "for cause" was pre-textual and intentionally designed to prevent him from exercising his rights to further benefits under the AIC Pension Plan.

30.    At all times material hereto, AIC maintained the Art Institute of Chicago Pension Plan ("AIC Pension Plan").

31.    Upon information and belief, the AIC Pension Plan is an ERISA qualified employee pension benefit plan as defined by 29 U.S.C. §1002(2)(A).

32.    The AIC Pension Plan provides participants with a monthly pension benefit upon retirement that continues over the remainder of the participant's lifetime and over the participant's surviving spouse's lifetime.  (Exhibit A).

33.    Plaintiff, Gregory Cahillane, is a plan participant within the meaning of the AIC Pension Plan.

34.    At all times material hereto Gregory Cahillane satisfied all conditions precedent to vesting and awarding of post-termination benefits under the AIC Pension Plan.

35.    Pursuant to the AIC Pension Plan, on June 1, 1992, with five years of service, Gregory Cahillane became vested in his pension benefits.

36.    Upon information and belief, of the twenty-seven Protection Service Managers in the DOPS, only ten, including Plaintiffs, were scheduled to receive similar pensions within the next ten

years.   In addition to Plaintiffs, two members of this group have been involuntarily terminated within the past three years and another is on work protected leave.

37.   On September 15, 2006, Defendant, AIC, discharged Plaintiff, Gregory Cahillane, for the purpose of interfering with his attainment of "normal retirement pension" benefits, as described in the AIC Pension Plan Summary. (Exhibit A, 7).

38.   Plaintiff, Gregory Cahillane, was employed by AIC in excess of nineteen years and maintained satisfactory or better performance records prior to his termination.

39.   Due to defendant, AIC, terminating plaintiff's employment, Craig Johnson suffered a major deduction in his monthly pension benefits as plaintiff was not anticipating retiring until December 2019, at the age of sixty-six (66).

40.   Plaintiff, Gregory Cahillane, avers that his involuntary termination allegedly "for cause" was pre-textual and intentionally designed to prevent him from exercising his rights to further benefits under the AIC Pension Plan.

41.   Plaintiff has not selected to receive his reduced pension payments at this time.

42.   As a direct and proximate result of defendant's violation of ERISA section 510, plaintiff has lost and will continue to lose income, including but not limited to, wages, salary increases, medical and dental insurance, pension benefits and other employment benefits.  Plaintiff has also suffered disruption of his personal life and damage to his employment reputation

.     WHEREFORE, plaintiff, Gregory Cahillane, respectfully prays that this Court enter judgment in his favor and against defendant, AIC, as follows:

    a.   That a finding be entered that AIC intentionally discriminated against, and terminated, Gregory Cahillane in violation of ERISA section 510, 29 U.S.C. §1140;

    b.   That Gregory Cahillane be retroactively awarded all backpay including all benefits to which he would have been entitled or for which he would have attained an interest

or accrual, in order to be "made whole" but for Defendant, AIC, terminating his employment, from the date of termination until such time as judgment in this cause is rendered. Such order shall allow Plaintiff to be reimbursed for additional health premiums paid by Plaintiff due to COBRA enrollment and related higher health care continuation rates;

c.    That the Court order the Defendant to pay Plaintiff prejudgment interest on all backpay, compensation and benefits awarded under Paragraph b that have accrued prior the date of judgment;

d.    That Gregory Cahillane be awarded front pay including all benefits to which he would have been entitled or for which he would have attained an interest or accrual, in order to be "made whole" but for Defendant terminating his employment.

e.    That Gregory Cahillane be awarded a lump-sum cash equivalent amount that, after-tax, represents the actuarial equivalent of the vested pension benefit that Plaintiff would have fully accrued as of the late of (a) December 1, 2019 or (b) the date through which any Court-ordered front pay award must be made, under the Plan but for the Defendant terminating plaintiff's employment; such payment being a restitutionary equitable remedy available under ERISA;

f.    That Gregory Cahillane be awarded his costs of maintaining this action, including but not limited to, reasonable attorneys' fees, pursuant to 29 U.S.C. §1132(g)(1); and

g.    That Gregory Cahillane be awarded such other and further relief as this Court deems necessary to effectuate the purposes of ERISA.

## COUNT VI
## GREGORY CAHILLANE
## VIOLATION OF ADEA

1-42.   Plaintiff, Gregory Cahillane, reaffirms and realleges the allegations contained in paragraphs

1 through 42 of Count V as paragraphs 1 through 42 of Count VI.

43.    On or about January 9, 2007, Plaintiff, Gregory Cahillane, filed a charge of discrimination against Defendant, AIC, with the EEOC, Charge No. 440-2007-01942. (Exhibit F).

44.    Plaintiff's charge of discrimination was timely filed within three hundred days of the alleged unlawful employment practice occurred; thus, Plaintiff has satisfied all administrative prerequisites.

45.    Plaintiff, Gregory Cahillane, received the right to sue letter from the EEOC dated April 17, 2007.  Said right to sue letter is attached hereto as Exhibit G.  This case is filed within ninety days thereof.

46.    That on September 15, 2006, the defendant terminated the plaintiff's employment based on his age.

47.    Plaintiff, Gregory Cahillane, was born on November 11, 1953 and at all relevant times, he was in excess of 40 years of age.

48.    Defendants' conduct in terminating plaintiff and replacing him with, upon information and belief, a less qualified, younger Securitas contractor who earned less wages and did not receive employee pension and welfare benefits, was discriminatory and in violation of plaintiff's rights under the Age in Discrimination in Employment Act.

49.    Upon information and belief, the unlawful discriminatory practices by Defendants, as set forth above, were intentional.

50.    Defendants, at all relevant times, acted with malice or reckless indifference to the federally protected rights of Plaintiff in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.A. § 621.

51.    That the aforesaid acts by the Defendant have intentionally discriminated against Plaintiff.

52.    As a direct and proximate result of Defendants' violation of the ADEA, Plaintiff has lost and

22

will continue to lose income, including but not limited to wages, raises, insurance and other employment benefits. Plaintiff has also suffered severe emotional distress and humiliation about the ability to support himself, as well as disruption of his personal life and damage to his employment reputation.

WHEREFORE, Plaintiff, Gregory Cahillane, respectfully prays that judgment be entered against Defendants for recovery of reasonable damages in an amount greater than Seventy-Five Thousand Dollars ($75,000.00), together with interest thereon, as well as such other damages as may be proven at the time of trial, including but not necessarily limited to, actual, consequential and punitive damages, attorneys fees and cost, and such other and further relief as this Court may deem appropriate.

**COUNT VII**
**ALBERTINE CONNELL**
**VIOLATION OF SECTION 510 OF ERISA**

1-21.   Plaintiff, Albertine Connell, reaffirms and realleges the allegations contained in paragraphs 1 through 21 above as paragraphs 1 through 21 of this Count VII.

22.    Plaintiff, Albertine Connell, began her employment with defendant, AIC, on October 8, 1984, as a Security Guard in the DOPS.

23.    Plaintiff, Albertine Connell, was promoted to Security Supervisor in 1990.

24.    Plaintiff maintained excellent, exceeding expectations performance reviews from 1987 through 2002.

25.    In 2004, the new management team restructured the DOPS, and Plaintiff, Albertine Connell, was "promoted" from a hourly position to a salaried, Fair Labor Standards Act exempt, position, with a modest increase to her salary and a significant increase of expectations placed upon Plaintiff.

26.    Upon information and belief, between 2005 and 2006, Plaintiff's Supervisors were told by

the AIC Associate Director of Museum Operations to terminate the employment of Plaintiff in addition to two of Plaintiff's co-workers, Johnson and Cahillane.

27.   At all relevant times, plaintiff, Albertine Connell, was qualified for her position as Security Manager.

28.   On March 20, 2006, plaintiff, Albertine Connell, received notice of her termination from Ray Van Hook without explanation.

29.   Defendant, AIC, alleges plaintiff, Albertine Connell, was terminated for cause based upon an incident on March 10, 2006 in which Connell arrived early for work and did not respond to a call for assistance.  Connell did not respond because another Security Manager was already on duty and he should have responded to the call.  Additionally, her shift had not yet begun.

30.   At all times material hereto, AIC maintained the Art Institute of Chicago Pension Plan ("AIC Pension Plan").

31.   Upon information and belief, the AIC Pension Plan is an ERISA qualified employee pension benefit plan as defined by 29 U.S.C. §1002(2)(A).

32.   The AIC Pension Plan provides participants with a monthly pension benefit upon retirement that continues over the remainder of the participant's lifetime and over the participant's surviving spouse's lifetime.  (Exhibit A).

33.   Plaintiff, Albertine Connell, is a plan participant within the meaning of the AIC Pension Plan.

34.   At all times material hereto Albertine Connell satisfied all conditions precedent to vesting and awarding of post-termination benefits under the AIC Pension Plan.

35.   Pursuant to the AIC Pension Plan, on October 8, 1989, with five years of service, Albertine Connell became vested in her pension benefits.

36. Upon information and belief, of the twenty-seven Protection Service Managers in the DOPS, only ten, including Plaintiffs, were scheduled to receive similar pensions within the next ten years. In addition to Plaintiffs, two members of this group have been involuntarily terminated within the past three years and another is on work protected leave.

37. On March 20, 2006, Defendant, AIC, discharged plaintiff, Albertine Connell, for the purpose of interfering with her attainment of "normal retirement pension" benefits, as described in the AIC Pension Plan Summary. (Exhibit A, 7).

38. Plaintiff, Albertine Connell, was employed by AIC in excess of twenty years and maintained satisfactory or better performance records prior to her termination.

39. Due to defendant, AIC, terminating plaintiff's employment, Albertine Connell was forced to take early retirement and suffered a major deduction in her monthly pension benefits as plaintiff was not anticipating retiring until June 1, 2010, at the age of sixty-five (65).

40. Plaintiff, Albertine Connell, avers that her involuntary termination allegedly "for cause" was pre-textual and intentionally designed to prevent her from exercising her rights to further benefits under the AIC Pension Plan.

41. On or about June 1, 2006, Albertine Connell was granted her reduced "early retirement" pension benefit.

42. As a direct and proximate result of defendant's violation of ERISA section 510, plaintiff has lost and will continue to lose income, including but not limited to, wages, salary increases, medical and dental insurance, pension benefits and other employment benefits. Plaintiff has also suffered disruption of her personal life and damage to her employment reputation.

WHEREFORE, plaintiff, Albertine Connell, respectfully prays that this Court enter judgment in her favor and against defendant, AIC, as follows:

h. That a finding be entered that AIC intentionally discriminated against, and

terminated, Albertine Connell in violation of ERISA section 510, 29 U.S.C. §1140;

i.    That Albertine Connell be retroactively awarded all backpay including all benefits to which she would have been entitled or for which she would have attained an interest or accrual, in order to be "made whole" but for Defendant, AIC, terminating her employment, from the date of termination until such time as judgment in this cause is rendered.  Such order shall allow Plaintiff to be reimbursed for additional health premiums paid by Plaintiff due to COBRA enrollment and related higher health care continuation rates;

j.    That the Court order the Defendant to pay Plaintiff prejudgment interest on all backpay, compensation and benefits awarded under Paragraph b that have accrued prior the date of judgment;

k.    That Albertine Connell be awarded front pay including all benefits to which she would have been entitled or for which she would have attained an interest or accrual, in order to be "made whole" but for Defendant terminating her employment.

l.    That Albertine Connell be awarded a lump-sum cash equivalent amount that, after-tax, represents the actuarial equivalent of the vested pension benefit that Plaintiff would have fully accrued as of the late of (a) June 1, 2010 or (b) the date through which any Court-ordered front pay award must be made, under the Plan but for the Defendant terminating plaintiff's employment; such payment being a restitutionary equitable remedy available under ERISA;

m.    That Albertine Connell be awarded his costs of maintaining this action, including but not limited to, reasonable attorneys' fees, pursuant to 29 U.S.C. §1132(g)(1); and

n.    That Albertine Connell be awarded such other and further relief as this Court deems necessary to effectuate the purposes of ERISA.

## COUNT VIII
## ALBERTINE CONNELL
## VIOLATION OF ADEA

1-42. Plaintiff, Albertine Connell, reaffirms and realleges the allegations contained in paragraphs 1 through 42 of Count VII as paragraphs 1 through 42 of Count VIII.

43.    On or about October 13, 2006, Plaintiff, Albertine Connell, filed a charge of discrimination against Defendant, AIC, with the EEOC Charge No. 440-2007-00282 (Exhibit H).

44.    Plaintiff's charge of discrimination was timely filed within three hundred days of the alleged unlawful employment practice occurred; thus, Plaintiff has satisfied all administrative prerequisites.

45.    Plaintiff, Albertine Connell, received the right to sue letter from the EEOC dated April 17, 2007.  Said right to sue letter is attached hereto as Exhibit I.  This case is filed within ninety days thereof.

46.    That on March 20, 2006, the defendant terminated the plaintiff's employment based on her age.

47.    Plaintiff, Albertine Connell, was born on May 6, 1945, and at all relevant times, she was in excess of 40 years of age.

48.    Defendants' conduct in terminating plaintiff and replacing her with, upon information and belief, a less qualified, younger Securitas contractor who earned less wages and did not receive employee pension and welfare benefits, was discriminatory and in violation of plaintiff's rights under the Age in Discrimination in Employment Act.

49.    Upon information and belief, the unlawful discriminatory practices by Defendants, as set forth above, were intentional.

50.    Defendants, at all relevant times, acted with malice or reckless indifference to the federally

protected rights of Plaintiff in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.A. § 621.

51.     That the aforesaid acts by the Defendant have intentionally discriminated against Plaintiff.

52.     As a direct and proximate result of Defendants' violation of the ADEA, Plaintiff has lost and will continue to lose income, including but not limited to wages, raises, insurance and other employment benefits.  Plaintiff has also suffered severe emotional distress and humiliation about the ability to support himself, as well as disruption of his personal life and damage to her employment reputation.

WHEREFORE, Plaintiff respectfully prays that judgment be entered against Defendants for recovery of reasonable damages in an amount greater than Seventy-Five Thousand Dollars ($75,000.00), together with interest thereon, as well as such other damages as may be proven at the time of trial, including but not necessarily limited to, actual, consequential and punitive damages, attorneys fees and cost, and such other and further relief as this Court may deem appropriate.

**JURY TRIAL DEMANDED**

Respectfully submitted,

/s John S. Bishof, Jr.
John S. Bishof, Jr., #213926
Law Office of John Bishof P.C
77 West Washington St., Suite 1910
Chicago, IL 60602
Ph: 312-630-2048  Fax: 312-630-2085

28

08CV4023
JUDGE CONLON
MAGISTRATE JUDGE ASHMAN


PH

# The Art Institute of Chicago
# Pension Plan
# Summary Plan Description

EFFECTIVE AS OF JULY 1, 2004

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................. 1

WHO THE PLAN COVERS .............................................................................................. 1
   Eligibility ......................................................................................................................... 1
   Non-Pension Eligible Employees ................................................................................ 1

IMPORTANT TERMS ....................................................................................................... 2
   Average Monthly Earnings ......................................................................................... 2
   Break in Service ............................................................................................................ 2
   Computation Period ..................................................................................................... 3
   Credited Service ........................................................................................................... 3
   Earnings .......................................................................................................................... 4
   Forfeiture of Credited Service and Service ............................................................. 4
   Hours of Employment .................................................................................................. 4
   Normal Retirement Age .............................................................................................. 5
   Primary Social Security Benefit .................................................................................. 5
   Service ............................................................................................................................. 5

PARTICIPATING IN THE PLAN ..................................................................................... 6
   Participation ................................................................................................................... 6
   When Participation Ends .............................................................................................. 6
   Participation beyond Normal Retirement Age ........................................................ 7

VESTING ............................................................................................................................. 7

WHEN YOU CAN RECEIVE A PENSION ..................................................................... 7
   Normal Retirement Pension ........................................................................................ 7
   Early Retirement Pension ............................................................................................ 7
   Vested Retirement Pension ......................................................................................... 8
   Disability Retirement Pension .................................................................................... 8
   Late Retirement Pension ............................................................................................. 8
   Mandatory Retirement Pension ................................................................................. 8
   Retirement Pensions Prior to July 1, 2004 ................................................................ 9

HOW PENSION BENEFITS ARE CALCULATED
FOR PARTICIPANTS HIRED ON OR AFTER JULY 1, 1982 .................................... 9
   Calculation of Normal Retirement Pension ............................................................. 9
   Calculation of Early Retirement Pension ................................................................ 10
   Calculation of Vested Retirement Pension ............................................................. 11
   Calculation of Disability Retirement Pension ........................................................ 11
   Calculation of Late Retirement Pension ................................................................. 12
   Protection of Pension Benefits Accrued as of June 30, 2004 ................................ 12
   Limitations on Pension Benefits ............................................................................... 13
   Social Security Benefits .............................................................................................. 13

## TABLE OF CONTENTS

PAGE

APPENDIX A

- A faculty member whose employment commenced before November 18, 1971 and who made an election to be covered under the Art Institute's Defined Contribution Retirement Plan as of November 18, 1971.

- A telefund associate.

- An employee whose salary is solely funded by a non-recurring grant or gift which does not provide for contributions to a pension plan.

- An intern or fellow.

- An office support assistant.

- A retail assistant.

- An independent contractor or consultant as determined by the payroll or personnel records maintained by the Art Institute at the time services are performed regardless of whether such classification is later upheld for any purpose by a court or a federal, state, or local regulatory authority.

- An employee whose services for the Art Institute are performed pursuant to an agreement, including the legal plan document for the Plan, that provides that you are not eligible to participate in the Plan.

- An individual whose services for the Art Institute are performed pursuant to an agreement between the Art Institute and any other person including a leasing organization.

An employee's or individual's title, job position, contract status shall be determined by the payroll or personnel records maintained by the Art Institute and shall be binding and conclusive for all purposes of the Plan.

## IMPORTANT TERMS

Pension plans are complex and use important words and phrases that have special meanings. To help you understand them, this section defines and explains some of the more important terms used in this booklet.

### Average Monthly Earnings

Your Average Monthly Earnings is the monthly average of your Earnings for 60 consecutive months that results in the highest monthly average. If you do not have earnings for 60 consecutive months, your Average Monthly Earnings is the monthly average of all your earnings. Only whole months of earnings are taken into account.

### Break in Service

You will incur a one-year "Break in Service" if you complete less than 501 Hours of Employment during a computation period.

For purposes of determining whether you have incurred a one-year Break in Service, special rules apply: (1) you will be credited with up to 501 Hours of Employment during a maternity or paternity leave (as described below) that begins on or after July 1, 1985 for the computation period in which your maternity or paternity leave begins based on your regularly scheduled hours of work (or at 8 hours for each normal working day if the Art Institute is unable to determine your regularly scheduled hours of work) if it is necessary to prevent a one-year Break in Service; otherwise such hours will be credited to the following computation period; and (2) you will be credited with Hours of Employment during a family or medical leave based on your regularly scheduled hours of work but only to the extent required by the Family and Medical Leave Act of 1993 (FMLA).

A maternity or paternity leave is a period during which you are initially absent from work on account of (1) your pregnancy, (2) birth of your child, (3) placement of a child in connection with your adoption of such child; or (4) care of a child described in (2) or (3) immediately after such birth or placement. You must timely provide the Art Institute with sufficient information to establish that your absence from work is a maternity or paternity leave.

For Breaks in Service beginning prior to July 1, 1985, the rules were different and you should contact Human Resources - Benefits if you have any questions.

**Computation Period**

The Plan uses "computation periods" to determine your participation date, Service and Credited Service which are referred to as your eligibility computation period, service computation period, and benefit computation period, respectively. Your computation period is the 12-consecutive month period beginning on the date you first complete an Hour of Employment for the Art Institute and each anniversary of that date.

**Credited Service**

Credited Service is used to calculate the amount of your benefits under the Plan. You will be credited with one (1) year of Credited Service for each benefit computation period (i.e., the 12-consecutive month period beginning on the date you first complete an Hour of Employment for the Art Institute and each anniversary of that date) during which you complete at least 1,000 Hours of Employment except as follows:

- If you are hired by the Art Institute in a non-pension-eligible position and subsequently transfer to a pension-eligible position, you will not receive Credited Service for the period of time you perform services in a non-pension-eligible position. See page 1 for employees and individuals who hold non-pension eligible positions. For example, if you are hired as an intern or fellow and subsequently transfer to a pension-eligible position, the time during which you performed services as an intern or fellow is not counted toward your Credited Service.

3

week while you are on paid professional advancement leave or paid sabbatical leave (as each leave is described in the Art Institute's Employee Handbook), and (3) Hours of Employment based on your regularly scheduled hours of work while you are on military service leave but only to the extent required by the Uniformed Services Employment and Reemployment Rights Act of 1994. You will also be credited with up to a maximum of 501 hours of employment for each hour you are on vacation, holiday, sick leave, layoff, jury duty, or authorized unpaid leave of absence.

Prior to July 1, 1994, Hours of Employment were credited differently from that stated above. You should contact Human Resources - Benefits if you have any questions regarding your Hours of Employment.

### Normal Retirement Age

The Normal Retirement Age for all participants who are employed by the Art Institute on or after July 1, 2004 is the later of (1) the date you attain age 65 or (2) the date you complete five (5) years of Service or five (5) years of participation in the Plan, whichever occurs earlier.[1]

### Primary Social Security Benefit

Pension benefits under the Plan are coordinated with your estimated Social Security benefits to reflect the Social Security (FICA) taxes that your employers (including the Art Institute) pay on your behalf. Your Primary Social Security Benefit is the estimated monthly amount that you will receive as a retirement benefit from Social Security at your Normal Retirement Age (or your age when you terminate employment from the Art Institute, if later). Unless you provide your actual earning history, your Primary Social Security Benefit is based on an *estimate* of your earnings for all years that are considered in calculating your Social Security benefits.

### Service

Service is used to determine whether you are "vested" and whether you are eligible to receive an early retirement pension or survivor benefits. You will be credited with one (1) year of Service for each service computation period (i.e., the 12-consecutive month period beginning on the date you first complete an Hour of Employment for the Art Institute and each anniversary of that date) during which you complete at least 1,000 Hours of Employment unless you forfeit your Service as a result of a five-year Break in Service. See *Forfeiture of Credited Service and Service* above for when you may forfeit Service as a result of a Break in Service.

---

[1]    If you were hired by the Art Institute prior to July 1, 1982 and terminated employment prior to July 1, 2004, your Normal Retirement Age is the later of (1) the date you attain age 62 or (2) the date you complete five (5) years of Service or five (5) years of participation in the Plan, whichever occurs earlier.

**Participation beyond Normal Retirement Age**

If you work beyond your Normal Retirement Age and are scheduled to work at least a 1,000 hours of employment during a 12-month period, you will continue to accrue Credited Service and Service in the same manner as any other active participant.

## VESTING

Once you are vested, you have earned a nonforfeitable right to a pension under the Plan even if you terminate your employment with the Art Institute before reaching your Normal Retirement Age. You will become vested upon the earlier of:

- The date you complete five (5) years of Service.
- The date you attain your Normal Retirement Age while employed by the Art Institute.

If your employment with the Art Institute terminates before you are vested, then you are not entitled to any benefits from the Plan. See *Forfeiture of Credited Service and Service* on page 4 for when you may forfeit Service as a result of a Break in Service.

## WHEN YOU CAN RECEIVE A PENSION

Once you are vested, you are eligible for a pension following termination of employment with the Art Institute. Generally, you can start receiving your pension immediately if you terminate employment upon attaining your Normal Retirement Age. If you terminate employment prior to your Normal Retirement Age, you can start receiving your pension – anytime on or after age 55 – but your monthly pension payment will be reduced. All references to age 65 in this section are references to the Plan's Normal Retirement Age because for most participants, age 65 is their Normal Retirement Age.[1]

**Normal Retirement Pension**

You are eligible for a normal retirement pension if you terminate employment with the Art Institute upon attaining age 65. A normal retirement pension is payable monthly starting on the first day of the month following your termination date.

**Early Retirement Pension**

You are eligible for an early retirement pension so long as you complete 10 or more years of Service prior to terminating employment with the Art Institute. An early retirement pension is

---

[1]     If you are hired by the Art Institute or commence participation in the Plan after age 60, your Normal Retirement Age is the later of (1) the date you attain age 65 or (2) the date you complete five (5) years of Service or five (5) years of participation in the Plan, whichever occurs earlier.

required beginning date is extremely important.  If the total amount distributed is less than the required minimum amount, federal tax laws impose a 50 percent excise tax on the difference.

**Retirement Pensions Prior to July 1, 2004**

If you terminated employment with the Art Institute prior to July 1, 2004, the type of pensions available under the Plan were different.  Refer to the attached Appendix A for a description of the type of pensions available to you.  You can also contact Human Resources – Benefits if you have any questions.

# HOW PENSION BENEFITS ARE CALCULATED
# FOR PARTICIPANTS HIRED ON OR AFTER JULY 1, 1982

This section explains how the different types of pensions are calculated for participants hired on or after July 1, 1982.  All pensions are calculated as payable in the form of lifetime monthly payments.  This form of payment is referred to as a "single life annuity."  You may choose a payment option other than a single life annuity but your monthly payments will be reduced.  See *How Pensions are Paid* on page 18 for further information.

**Calculation of Normal Retirement Pension**

If you are eligible for a normal retirement pension, your normal retirement pension is first calculated under a two-part formula based on your Average Monthly Earnings and Credited Service at the time you terminate employment with the Art Institute:

> Part A Benefit:    2½% of your Average Monthly Earnings in excess of your estimated monthly Primary Social Security Benefit multiplied by your Credited Service up to 20 years, <u>plus</u>
>
> Part B Benefit    1% of your Average Monthly Earnings multiplied by your Credited Service in excess of 20 years.

Your normal retirement pension is then compared to the Plan's minimum monthly benefit.  You will receive the greater of your normal retirement pension or the greater of the Plan's minimum monthly benefit of $20 for each year of Credited Service.

For example, suppose you terminate employment with the Art Institute upon reaching your Normal Retirement Age of 65 and at that time, you have:

- Average Monthly Earnings of $2,500,
- An estimated monthly Primary Social Security Benefit of $860, and
- Credited Service of 30 years.

Your Average Monthly Earnings in excess of your Primary Social Security Benefit would be $1,640 ($2,500 minus $860).  Your normal retirement pension would be calculated as follows:

commencement date precedes age 65, your normal retirement pension of $892 is reduced as follows:

| | |
|---|---|
| Monthly normal retirement pension @ 65 | $ 892 |
| Early retirement reduction factor (6% for 5 years) | 30% |
| Early retirement reduction | (268) |
| Monthly early retirement pension @ 60 | $ 624 |

If you were a participant in the Plan as of June 30, 2004, your early retirement pension is then compared to your "protected" early retirement pension and you will receive the greater of the two. See *Protection of Pension Benefits Accrued as of June 30, 2004* below.

## Calculation of Vested Retirement Pension

If you are eligible for a vested retirement pension, your vested retirement pension is calculated in the same way as an early retirement pension. As with an early retirement pension, you can start a vested retirement pension as early as age 55. However, if you terminated employment with less than 10 years of Service, the early retirement reduction factor of ½% per month does not apply. Instead, if you elect to start payments before age 65, your normal retirement pension (or minimum monthly benefit, if greater) is actuarially reduced for each full month that payments commence prior to age 65 resulting in a smaller monthly benefit than would result using the early retirement reduction factor of ½% per month.

If you were a participant in the Plan as of June 30, 2004, your vested retirement pension is then compared to your "protected" vested retirement pension and you will receive the greater of the two. See *Protection of Pension Benefits Accrued as of June 30, 2004* below.

## Calculation of Disability Retirement Pension

If you are eligible for a disability retirement pension, your disability retirement pension is calculated in the same way as a normal retirement pension based on your Average Monthly Earnings and Credited Service determined as follows:

- Your Average Monthly Earnings and monthly Primary Social Security Benefit will be determined based on the assumption that your Earnings continued at a monthly rate equal to the greater of: (1) your average monthly Earnings for the last full calendar year of employment prior to becoming Disabled or (2) your average monthly Earnings for the calendar year in which you became Disabled, until you are no longer Disabled or your disability retirement pension begins, whichever occurs earlier.

- Your Credited Service is not determined as of the date you became Disabled; instead you will continue to receive Credited Service until you are no longer Disabled or your disability retirement pension begins, whichever occurs earlier.

**Limitations on Pension Benefits**

Federal tax laws limit the amount of Earnings that can be used to calculate your pension benefit and limit the maximum pension benefit you can receive from the Plan. However, as a practical matter, your pension benefits will not be adversely affected as both limits are very high. For 2004, the maximum annual Earning limit is $205,000 and the maximum annual pension benefit is $165,000 for pensions paid in the form of a single life annuity.

**Social Security Benefits**

Social Security benefits are in addition to your pension from the Plan. The earliest you can start receiving Social Security benefits is age 62. You can also retire at any time between age 62 and your Social Security Full Retirement Age. However, if you start your Social Security benefits earlier than your Social Security Full Retirement Age, monthly benefit payments are reduced for each month prior to your full retirement age.

For more information, contact your local Social Security Administration office or visit their web site at www.ssa.gov. You can call the Social Security Administration toll-free at (800) 772-1213 at any time. People who are deaf or hard of hearing may call their toll-free "TTY" number, (800) 325-0778.

## HOW PENSION BENEFITS ARE CALCULATED
## FOR PARTICIPANTS HIRED PRIOR TO JULY 1, 1982

This section explains the types of pension benefits that are available to participants hired prior to July 1, 1982. All pensions are calculated as payable in the form of lifetime monthly payments. This form of payment is referred to as a "single life annuity." You may choose a payment option other than a single life annuity but your monthly payments will be reduced. See *How Pensions are Paid* on page 18 for further information.

**Calculation of Normal Retirement Pension**

If you are eligible for a normal retirement pension, your normal retirement pension is first calculated under a two-part formula based on your Average Monthly Earnings and Credited Service at the time you terminate employment with the Art Institute:

| | |
|---|---|
| Part A Benefit: | 1½% of your Average Monthly Earnings multiplied by your Credited Service, plus |
| Part B Benefit: | 1% of your Average Monthly Earnings in excess of $550 multiplied by your Credited Service up to 15 years. |

Part B Benefit:

10 years (years in excess of 20) times 1% equals 10%
10% times $2,500 equals .................................................................................$ 250
Monthly normal retirement pension @ 65....................................................$1,070

Since your normal retirement pension is greater than the $1,070 alternate normal retirement benefit and the $600 minimum monthly benefit ($20 times 30 years), your normal retirement pension is $1,418 payable at age 65 assuming that $1,418 is greater than your pension benefit determined as of June 30, 2004.

> **The calculations for the various types of pensions described below assume that the normal retirement pension formula provides the greatest benefit. In the event that your pension benefit is greater under the alternative normal retirement pension formula, your pension will be calculated as described in *How Pension Benefits are Calculated for Participants Hired on or After July 1, 1982* starting on page 9.**

**Calculation of Early Retirement Pension**

If you are eligible for an early retirement pension, your early retirement pension is calculated in the same way as a normal retirement pension based on your Average Monthly Earnings and Credited Service determined as of your termination date.

If the normal retirement pension formula applies to you (e.g., the alternative normal retirement pension formula does not apply) and if you elect to start payments before age 65, your normal retirement pension is reduced by the following early retirement reduction factors to reflect the expectation that you will receive payments for a longer period of time:

- 1/4 of 1% of the Part A Benefit for each full month that payments commence prior to age 65 (a 3% annual rate), and

- 5/12 of 1% of the Part B Benefit for each full month that payments commence prior to age 65 (a 5% annual rate).

Suppose you elect to start your pension payments at age 62. Applying the early retirement reduction factors described above, your normal retirement pension of $1,418 (Part A Benefit of $1,125 plus Part B Benefit of $293) is reduced as follows:

Part A Benefit @ age 65 ............................................................................$1,125
Early retirement reduction factor (3% for 3 years)............................................ 9.0%
Early retirement reduction ($1,125 multiplied by 9%)....................................(101)
Monthly Part A early retirement pension @ 62..............................................$1,024

**Calculation of Late Retirement Pension**

If you are eligible for a late retirement pension, your late retirement pension is first calculated in the same way as a normal retirement pension based on your Average Monthly Earnings and Credited Service determined as of your termination date or the date you elect to start payments because you are scheduled to work less than 1,000 hours of employment during a 12-month period. Your late retirement pension is then compared to the actuarial equivalent of your normal retirement pension at age 65. You will receive the greater of your late retirement pension or the actuarial equivalent of your normal retirement pension as previously described as reduced in each case for any pension payments you previously received.

**Protection of Pension Benefits Accrued as of June 30, 2004**

Effective July 1, 2004, the Plan was amended to change the Normal Retirement Age from age 62 to age 65 and the normal and early retirement pension provisions of the Plan were amended as described above. Prior to July 1, 2004, if you terminated employment at the Normal Retirement Age of age 62, you were eligible for full pension benefits at age 62 (i.e., the early retirement reduction factors of 3% and 5% per year were not applied if you started your pension payments on or after age 62). If you terminated employment with at least ten years of Service and started your pension payments prior to age 62, your pension benefits were reduced to account for its being paid early but the reduction was calculated from age 62 to your benefit commencement date. After July 1, 2004, if you terminate employment with at least ten years of Service and start your benefit payments prior to age 65, your early retirement pension will be calculated using the early retirement reduction factors of 3% and 5% per year from age 65 to your benefit commencement date as described above. However, your normal retirement pension and early retirement pension will then be compared to your pension benefit as determined on June 30, 2004 and you will receive the greater of the two.

This section is not intended to provide you with a complete summary of the amendments to the Plan's Normal Retirement Age and early retirement pension provisions. A more detailed summary was distributed to all participants who were employed by the Art Institute as of June 30, 2004 in May 2004 along with a personalized benefit statement intended to illustrate the effect of the amendments. Because the amendments affect different participants in different ways and in some cases not at all, the May 2004 summary and your personalized benefit statement is your best source of information regarding the impact of the amendments on your pension benefits.

If you terminated employment with the Art Institute prior to July 1, 2004, the amendments to the Plan's normal and early retirement pension provisions do not apply to you and if you are eligible for a pension, your pension will be calculated under the terms of the Plan prior to amendment. If you wish to start your pension or wish to know the amount of your pension benefit contact Human Resources – Benefits and a benefit calculation statement will be provided to you.

annuitant will receive 50%, 75%, or 100% of your monthly pension depending on the percentage you choose. Under this option, the monthly pension that would otherwise be payable for your lifetime is reduced to reflect that your pension will be paid over two lifetimes instead of one.

- *10-Year Certain and Life Annuity.* This option pays a reduced monthly pension for whichever period is longer: your life or the 10-year guaranteed period. If you die during the guaranteed period, payments continue to your beneficiary until the end of the guaranteed period. If you die after the end of the guaranteed period, payments stop at your death. Under this option, the monthly pension that would otherwise be payable for your lifetime is reduced to provide payments for the guaranteed period.

- *Level Income Option — with or without Contingent Annuity.* This option is available only if you start your pension between age 55 and age 62 and is intended to provide you with approximately equal amounts of income before and after Social Security payments begin, so that your monthly income will be level throughout your retirement years. This option is available with or without a Contingent Annuity option. In general, this option pays an increased monthly pension until you reach age 62, then it pays a reduced monthly pension (in some cases, no pension) for your lifetime after you are eligible for Social Security payments. If you elect this option without a Contingent Annuity, all payments stop at your death. If you elect this option with a Contingent Annuity and your contingent annuitant lives longer than you, he or she continues to receive a monthly pension for his or her life. Depending on the percentage you choose, your contingent annuitant will receive 50%, 75%, or 100% of the monthly pension you would have received.

- *Lump Sum Distribution.* This option is available only if the lump sum value of your pension is $5,000 or less. See *Required Payment Options* below.

**Payment Option Comparison**

The following example is intended to help you compare the amount of a monthly pension paid under the Single Life Annuity option (the payment option which provides unreduced benefits for your lifetime) to the monthly pension paid under a Contingent Annuity option. Assume you retire at age 65 and your spouse is age 62 with a monthly normal retirement pension of $1,000. The financial effect of converting a Single Life Annuity into a Contingent Annuity with a 50%, 75%, or 100% survivor benefit is as follows:

|  | Single Life Annuity | 50% Contingent Annuity | 75% Contingent Annuity | 100% Contingent Annuity |
|---|---|---|---|---|
| Monthly pension for your lifetime | $1,000 | $895 | 851 | $810 |
| Monthly pension to your contingent annuitant if he or she survives you | 0 | 448 | 638 | 810 |

**Tax Information**

Pension payments are subject to federal income taxation when you receive them. This section describes some of the rules that affect the taxation of your pension.

- *Monthly Pension Payments.* Your monthly pension is not subject to mandatory federal income tax withholding. You may elect that withholding not apply to your payments but if you do nothing, a federal income tax withholding rate of 10% will apply. The election to waive withholding is included with the pension application.

- *Lump Sum Distribution.* A lump sum distribution is subject to a mandatory federal income tax withholding rate of 20% to the extent you do not elect a direct rollover to another tax-deferred retirement vehicle such as an individual retirement account or eligible employer plan. If you timely roll over all or a part of your lump sum distribution, that portion will not be subject federal income tax in the year of distribution and will continue to be tax-deferred. Portions you do not roll over are treated as taxable income in the year of distribution and you may be required to pay income taxes in addition to the 20% withheld when you file your tax return for that year. You also may be required to pay an additional 10% tax penalty if your distribution is an early withdrawal (see below).

- *Early Distribution Penalty.* If you receive a lump sum distribution prior to age 59-1/2, the portion you do not roll over to another tax-deferred retirement vehicle is subject to an additional 10% tax penalty excise tax unless the distribution is made because:

  - You retire or leave the Art Institute at age 55 or older.
  - You die or become disabled.
  - The distribution is received pursuant to a qualified domestic relations order.

This tax information described above is not intended to give specific tax advice to you (or your beneficiaries). A more detailed summary, *Special IRS Tax Notice Regarding Plan Payments*, contains more information and is available on the Human Resources' website and from Human Resources - Benefits. Tax laws are complicated and change often. They also affect different individuals in different ways. A professional tax advisor is your best source of information about tax laws applicable to your distributions from the Plan.

**Rollovers from the Plan**

By law, you *cannot* roll over monthly payments that will last for your lifetime or for your lifetime and your beneficiary's lifetime, such as the pension paid by the Plan. If you receive a lump sum distribution, however, you may roll over all or a portion of it either directly or within 60 days after receipt into an individual retirement account or annuity (IRA) described in Section 408(a) or 408(b) of the Internal Revenue Code, a qualified plan described in Section 401(a) or 403(a) of the Internal Revenue Code, a tax-deferred annuity contract described in

21

**Death While Employed by the Art Institute**

If you die while actively employed by the Art Institute and have five (5) or more years of Service or while you are eligible for a disability retirement pension, your spouse is entitled to a survivor benefit. The amount of your spouse's survivor benefit is equal to 50% of your pension benefit calculated as of the date of your death without reduction for early payment, i.e., the early retirement reduction factors applicable to early retirement pensions or actuarial reduction for vested retirement pension (see page 8) unless your spouse is more than 10 years younger than you. In that case, the 50% survivor benefit is reduced to the actuarial equivalent of the pension that would be payable if your spouse were 10 years younger than you. Your spouse's survivor benefit is payable monthly commencing on the first day of the month coinciding with or next following your date of death and will continue for your spouse's lifetime. Upon his or her death, all payments stop.

If you die without a spouse but have a dependent child -- for example, if your spouse had died or if you are divorced -- the 50% survivor benefit will instead be payable monthly to the dependent child. A "dependent child" means an unmarried child under age 21. If there are two or more dependent children, the survivor benefit is divided equally among them. As each dependent child reaches age 21, marries, or dies, his or her benefit is apportioned to the remaining child or children. When there is no longer any child who qualifies as a dependent child, all payments stop.

If you die without a spouse or dependent children, the 50% survivor benefit will be payable monthly to your *dependent* parent or parents -- your mother and/or father living with you and eligible to be claimed as a dependent on your income tax return -- for life. If both dependent parents are living, the survivor benefit is divided equally among them. If a dependent parent dies, his or her share of the survivor benefit will be paid to the other parent. Upon the death of both dependent parents, all payments stop.

In each case, if the lump sum value of the survivor benefit is $5,000 or less, the survivor benefit will automatically be paid in a one-time cash payment(s) as soon as administratively feasible following your date of death and no monthly payments will be made.

**Death After Termination of Employment and Before Pension Starts**

If you have terminated employment and are entitled to a pension but die before your pension begins, your spouse is entitled to a lifetime monthly survivor benefit unless the lump sum value of the survivor benefit is $5,000 or less. In such case, the survivor benefit will automatically be paid in a one-time cash payment(s) as soon as administratively feasible following your date of death and no monthly payments will be made. The amount of your spouse's survivor benefit is determined as follows:

- If you die on or after age 55, your spouse will receive a survivor benefit equal to 50% of the pension benefit you would have received if you had started your pension on the first day coincident with or next following the first day of the

accordance with the terms of the Plan, determines eligibility for a pension and the amount of your pension benefit.

## Claims Procedures

If you feel you are being denied a pension or you disagree with the amount of your pension benefit, you (or your beneficiary or authorized representative) may file a claim with the Art Institute, in care of Human Resource – Benefits.  If all or part of your claim is denied, the Art Institute, or its delegate, will send you a written or electronic notice of denial containing the following:

- Specific reasons for the denial.
- References to the Plan provisions upon which the denial is based.
- A description of any missing information or material necessary to process your application ((together with an explanation why such material or information is necessary).
- An explanation of the Plan's appeals procedures.
- A statement of your right to bring a civil action under Section 502(a) of ERISA if your claim is denied upon appeal.

The Art Institute will send a notice of denial unless the Art Institute determines that special circumstances require an extension of time for processing your application.  In the event an extension is necessary, you will receive written or electronic notice of the extension prior to the expiration of the initial 90-day period.  The notice shall indicate the special circumstances requiring an extension of time and the date by which a final decision is expected to be rendered.  In no event shall the period of the extension exceed 90 days from the end of the initial 90-day period

## Appeals Procedures

If all or a part of your claim is denied and you (or your beneficiary) or your authorized representative wish to appeal the denial of your claim, you must submit a written appeal to the Art Institute, in care of Human Resource - Benefits, within 60 days after you receive the notice of denial.  You must exhaust the Plan's appeals procedures prior to seeking any other form of relief.  Under the Plan's appeals procedures:

- You may include written comments, documents, records, and other information relating to your claim.
- You may review all pertinent documents and, upon request, shall have reasonable access to or be provided free of charge, copies of all documents, records, and other information relevant to your claim.

years at the time the plan terminates; (3) benefits that are not vested because you have not worked long enough for the company; (4) benefits for which you have not met all of the requirements at the time the plan terminates; (5) certain early retirement payments (such as supplemental benefits that stop when you become eligible for Social Security) that result in an early retirement monthly benefit greater than your monthly benefit at the Plan's Normal Retirement Age; and (6) non-pension benefits, such as health insurance, life insurance, certain death benefits, vacation pay, and severance pay.

Even if certain of your benefits are not guaranteed, you still may receive some of those benefits from the PBGC depending on how much money the Plan has and on how much the PBGC collects from employers.

For more information about the PBGC and the benefits it guarantees, ask the Plan Administrator or contact the PBGC's Technical Assistance Division, 1200 K Street N.W., Suite 930, Washington, D.C. 20005-4026 or call (202) 326-4000 (not a toll-free number). TTY/TDD users may call the federal relay service toll-free at (800) 877-8339 and ask to be connected to (202) 326-4000. Additional information about the PBGC's pension insurance program is available through the PBGC's website on the Internet at http:// www.pbgc.gov.

**Non-Alienation of Benefits**

In general, your pension benefit cannot be assigned or alienated in any way. You may not sell, transfer, pledge, or otherwise use your pension benefits to obtain credit in any form. The Plan is not liable for or subject to, and will not pay, any debts or obligations of a participant who is eligible for benefits. The law makes a limited exception for qualified domestic relations order as described below.

**Qualified Domestic Relations Orders**

A state court can award part or all of your pension benefit by issuing a domestic relations order. A domestic relations order is a court-ordered judgment or decree under state law that requires payment of child support, alimony, or marital property rights to a spouse, former spouse, child, or other dependent. The person named in such an order is called an alternate payee. If the domestic relations order is qualified, the Plan may be required to pay all or part of your pension benefit to your alternate payee. To qualify, the order must clearly specify who is to be paid, the amount to be paid, the number of payments and the plan or plans to which the order applies. The form of benefit provided by the Plan cannot be changed. You (or your attorney) may contact Human Resources – Benefits to obtain a copy of the Plan's QDRO procedures. You will be notified if such an order is received against you.

accordance with applicable law. Upon termination of the Plan, all participants shall be 100% vested in any benefits accrued prior to the termination date and any amount remaining after all fixed and contingent liabilities of the Plan have been satisfied shall revert to the Art Institute.

## Employment Rights Not Implied

Participation in the Plan does not give you the right to be retained in the employ of the Art Institute, nor does it interfere with the right of the Art Institute to discharge or terminate an employee at any time without regard to the effect such discharge or termination may have on rights under the Plan.

## Your Rights to Information

You are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that you shall be entitled to:

### *Receive Information About Your Plan and Benefits*

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites, all documents governing the Plan, including insurance contracts, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Plan Administrator may make a reasonable charge for the copies.

- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

- Obtain a statement telling you whether you have a right to receive a pension at Normal Retirement Age (age 65) and if so, what your benefits would be at Normal Retirement Age if you stop working under the Plan now. If you do not have a right to a pension, the statement will tell you how many more years you have to work to get a right to a pension. This statement must be requested in writing and is not required to be given more than once every twelve (12) months. The Plan must provide the statement free of charge.

### *Prudent Actions by Plan Fiduciaries*

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of employee benefit plans. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other participants of the Plan and their beneficiaries. No one, including the Art Institute or any

# PLAN REFERENCES

| | |
|---|---|
| **Plan** | Plan Name:    The Art Institute of Chicago<br>                 Pension Plan<br><br>Plan Number:  001<br><br>When requesting additional information about the Plan from the Department of Labor, refer to the above plan number. |
| **Plan Sponsor** | The Art Institute of Chicago<br>111 South Michigan Avenue<br>Chicago, IL  60603<br>(312) 629-3371<br><br>Employer Identification Number (EIN):  36-2167725 |
| **Plan Administrator** | The Art Institute of Chicago<br>c/o Retirement Committee<br>111 South Michigan Avenue<br>Chicago, IL  60603<br>(312) 629-3371 |
| **Agent for Service of Legal Process** | The Art Institute of Chicago<br>General Counsel Office<br>111 South Michigan Avenue<br>Chicago, IL  60603<br>(312) 443-4940<br><br>Legal process may also be served on the Trustee, if applicable. |
| **Plan Trustee** | The Northern Trust Company<br>50 South LaSalle Street<br>Chicago, IL 60675 |
| **Plan Year** | July 1 through June 30 |

date you attain age 55.  If you elect to start your pension prior to age 65, your monthly pension payment is actuarially reduced to reflect an earlier benefit commencement date.

08CV4023
JUDGE CONLON
MAGISTRATE JUDGE ASHMAN

PH

# EXHIBIT B

The Art Institute of Chicago | The Collection | Exhibitions | Calendar | Visit | Families | Education | Libraries | About Us | Members | Shop

Search →

# Employee Guidelines

←Back to About Us

←Back to Staff Resources

Employee Guidelines

2006 Staff Holiday Schedule

Back to Table of Contents

## 13.0 MAJOR BENEFIT PLANS

This section highlights the major benefit plans offered to eligible employees of the AIC. The AIC's benefits plans, like those of most organizations, are complex and do not lend themselves to easy summarization. The Medical and Dental Plan, Life Insurance, Long-Term Disability, Long-Term Care, Flexible Benefits Program, and pension plans are described in Summary Plan Description booklets (SPD) that are issued to each eligible employee as appropriate and are available in Human Resources for review. These booklets provide detailed, specific information on all aspects of the plans and programs and how they will apply in an individual's case. An employee's rights and benefits are governed solely by these and other official plan documents.

Employees are encouraged to contact Human Resources Benefits when they have a question about any of the plans, whether it concerns enrollment, benefits, or changes to his or her elections. Information about claims procedures are included in the summary plan description booklets described above, including how to appeal a decision concerning a claim, if an employee disagrees with a decision regarding a claim. It is an employee's responsibility to promptly notify Human Resources Benefits regarding any changes in his or her personal situation which may impact his or her benefits (e.g., marriage, divorce, changes in his or her dependents or beneficiaries, etc.). In many cases, changes must be made within 30 days of the event.

The AIC reserves the right to modify or terminate its benefit plans and programs at any time.

### 13.1 Flexible Benefits Program

The AIC offers employees a number of insurance choices under the umbrella of its Flexible Benefits Program. Included in the Flexible Benefits Program are the Medical and Dental Insurance plans, Optional Life Insurance, and Health Care and Dependent Care Reimbursement Accounts. Since there are different eligibility criteria for the various plans included in the Flexible Benefits Program, employees are encouraged to read each section in this document for additional information on the specific criteria for each plan. An important feature of the Flexible Benefits Program is the allocation of employer-provided dollars that are given to eligible employees to use when selecting their insurance coverage. These employer-provided dollars are called "flex dollars ". Upon eligibility and each year during the Annual Open Enrollment period, employees are provided with updated information on the "flex dollars" that they will be given each pay period and the cost of the various insurance coverage plans. If an employee's flex dollars exceed the cost of the insurance plans that he or she has elected, the excess amount will be added to his or her check as taxable income. If an employee's flex dollars are not sufficient to cover the cost of the insurance elected, the excess amount will be deducted from the employee's paycheck on a pre-tax basis. This pre-tax feature saves the employee money in taxes since the amount of these deductions are not subject to federal, state or FICA income taxes.

In general, an employee will be permitted to make insurance coverage elections when he or she first becomes eligible for coverage. These elections will remain in effect until the employee is no longer eligible or makes a change. In most cases, changes to a coverage election will only be permitted during the annual open enrollment period held in October or November of each year. Changes are generally effective on January 1. Certain limited exceptions apply for individuals who experience a change in status in accordance with IRS guidelines for plans operating in accordance with §125. A Change in Status brochure has been developed to explain some of the situations that are considered a qualified change in status. The brochure is available on the Human Resources web site on the Intranet.

Employees who initially elect no optional life insurance and later wish to elect life insurance or who elect a lower amount of optional life insurance and later wish to increase coverage will be required to submit proof of good health to the insurance carrier. The carrier will determine whether to approve the additional coverage.

### 13.2 Medical and Dental Coverage

All new hires that are Regular Full-time, Special Projects, or benefits eligible Part-time Faculty are eligible for coverage on the first day of the month following one month of service from their first day at work. Individuals who are transferred, promoted or are newly eligible due to an increase in hours are eligible the first of the month following the effective date of their status

change.

Employees can choose from several medical options including:

* A High Deductible PPO (preferred provider organization) Medical plan
* A Standard Deductible PPO Medical plan
* A Low Deductible PPO Medical plan
* A Health Maintenance Organization-type plan
* No coverage

Eligible employees electing the no coverage option must provide proof of other coverage, in order to be allowed to waive AIC coverage. Acceptable proof includes a current medical insurance identification card with the employee's name printed on it, or a letter from another employer stating that an employee currently has coverage under its insurance plan, along with the effective date of coverage.

Employees may also choose from several dental options:

* A PPO Dental Plan
* A Dental Maintenance Organization (dental HMO)
* No coverage

*top*

Employees are encouraged to refer to the summary plan description booklets for these plans for additional information about how specific medical and dental expenses will be covered and to find out more about exclusions and limitations of the plans. In instances where a claim form is required, the employee may obtain a blank form from Human Resources Benefits or from the Human Resources web site on the Intranet. Claims are processed by the insurance company. They will advise employees directly of their decision via an Explanation of Benefits (EOB.) Employees may appeal a decision made by the insurance company by following the instructions included in the summary plan description for the applicable medical or dental plan. When an employee elects coverage, he or she will be given the opportunity to elect a coverage tier:

* Employee only
* Employee plus one dependent
* Employee plus two or more dependents

Eligible dependents include an employee's spouse or domestic partner and dependent children up to age 19 or if a full-time student, up to age 25 for the medical plans and dental PPO, and up to age 23 for the dental HMO. Additional information about the affidavit process and criteria for a domestic partner is included in the booklet describing the Flexible Benefits Program. Proof of full-time student coverage will be required from time-to-time at the insurance company's request as will be information about possible duplicate coverage for dependents.

In general, an employee will be permitted to make an election for medical and dental coverage and any dependents to be covered when the employee first becomes eligible for coverage. These elections will remain in effect until the employee is no longer eligible or makes a change. In most cases, changes to a medical and/or dental option or coverage tier will only be permitted during the annual open enrollment period held in October or November of each year. Changes are effective January 1. Certain limited exceptions apply for individuals who experience a change in status in accordance with IRS guidelines for plans operating in accordance with §125. A Change in Status brochure has been developed to explain some of the situations that are considered a qualified change in status. This brochure is available on the Human Resources web site on the Intranet.

Employees in the health maintenance organization-type medical plan or the dental HMO may change providers during the year subject to certain waiting periods as established by the vendor.

Coverage under these plans will end at the end of the month following the employee's termination of employment, or change to an ineligible employment classification, or hours reduction, or due to non-payment of premiums during an unpaid leave in accordance with the applicable leave of absence section of these Guidelines. Certain continuation provisions apply and are outlined in the applicable summary plan description booklet for the medical and dental plan in question.

*top*

### 13.3 Life Insurance and Accidental Death and Dismemberment Benefits

Regular Full-time new hires are eligible for coverage on the first day of the month following one month of service from their first day at work. Special Projects new hires are eligible for coverage on the first day of the month following one year of service from their first day at work. Individuals who are transferred, promoted or are newly eligible due to an increase in hours are eligible the first of the month following the effective date of their status change providing that they have met the minimum service requirements as outlined above.

Basic Life Insurance Coverage will be equal to two times the employee's base salary, adjusted to the next higher $500 if not a multiple of $500 (up to a maximum of $400,000). For faculty, base salary is defined as the contract salary amount on their primary faculty contract. For staff employees, base salary is defined as their annualized salary for their regular full-time primary position.

The AIC pays the full cost of Basic Life Insurance coverage. Basic Life Insurance coverage includes a matching amount of accidental death and dismemberment (AD&D) coverage. In the event of an accidental death, the employee's beneficiary will receive both basic life insurance and AD&D benefits. In the event of accidental dismemberment or loss of sight, an employee will be paid an amount according to the schedule of benefits included in the SPD.

Employees eligible for Basic Life Insurance who meet certain service and salary requirements prior to July 2, 2001, are eligible to participate in the AIC's split-dollar life insurance plan in lieu of retaining their Basic Life Insurance coverage. The maximum coverage amount is included in the applicable SPD booklet, which also contains additional information about coverage limitations and exclusions. Claims procedures and additional information are also included in the SPD.

Employees should note that according to tax guidelines, they may be subject to imputed income attributable to their Basic Life or split-dollar life insurance coverage. The AIC will comply with the most recent IRS guidelines when including any amounts of imputed income on the W-2 for each employee.

*top*

### 13.4 Optional Life Insurance

In addition to the Basic Life Insurance and AD&D coverage referenced above, Regular Full-time employees are eligible to elect additional Optional Life Insurance coverage in amounts equal to one times, two times, or three times their base salary. For Faculty, base salary is defined as the contract salary amount on their primary faculty contract. For Regular Full-time employees, base salary is defined as their annualized salary for their regular full-time primary position. Total life insurance under basic and optional may not exceed $750,000.

Regular Full-time new hires are eligible for Optional Life Insurance coverage on the first day of the month following one month of service from their first day at work. Employees who are transferred, promoted or are newly eligible due to an increase in hours are eligible the first of the month following the effective date of their status change providing that they have met the minimum service requirements as outlined above.

Employees pay the full cost of Optional Life Insurance and AD&D coverage. The cost is calculated based upon the employee's base salary and date of birth. The SPD booklet contains additional information about coverage limitations and exclusions.

Claims procedures and additional information are also included in the SPD. Proof of good health is required if an employee's total insurance coverage will be greater than three times base salary or $400,000. In addition, proof of good health will also be required if an employee either elects, or because of a salary increase, is eligible for, additional coverage of $25,000 or more and that employee is already covered for three times base salary (or $400,000 if less).

*top*

In general, an employee will be permitted to make insurance coverage elections when he or she first becomes eligible for coverage. These elections will remain in effect until the employee is no longer eligible or makes a change. In most cases, changes to a coverage election will only be permitted during the annual open enrollment period held in October or November of each year. Changes, once approved, are usually effective January 1. Certain limited exceptions apply for employees who experience a change in status in accordance with IRS guidelines for plans operating in accordance with §125. A Change in Status brochure has been developed to explain some of the situations that are considered a qualified change in status. This brochure is available on the Human Resources web site on the Intranet.

Employees who initially elect a lower amount or no optional life insurance and who later wish to increase or add coverage will be required to submit proof of good health to the insurance carrier. The carrier will determine whether to approve the additional coverage.

Employees should note that according to tax guidelines, they may be subject to imputed income attributable to their Optional Life Insurance coverage. The AIC will comply with the most recent IRS guidelines when including any amounts of imputed income on the W-2 for each employee.

*top*

### 13.5 Long Term Disability

The long-term disability (LTD) plan provides important coverage if an employee cannot work due to a total disability which has lasted for more than 90 consecutive days. Regular Full-time employees will become eligible for this coverage after working six months in a regular full-time position. Employees can choose from two LTD options

* Basic coverage equal to 50% of base salary, up to a $10,000 monthly maximum.
* High option coverage equal to 66 2/3% of base salary, up to a $13,500 monthly maximum.

For Faculty, base salary is defined as the contract salary amount on their primary faculty contract. For Regular Full-time employees, base salary is defined as the annualized salary of their regular full-time primary position as of October 1st of each year. Certain limited exceptions apply for employees who work two or more regular jobs that enable the total hours worked and base salaries to be combined for benefit purposes. This exception applies to employees who hold either a regular full-time staff position and a regular part-time staff position, or two regular part-time staff positions that total at least 21 hours per week.

Eligible employees receive flex dollars from the AIC that can be used towards the cost of basic coverage or towards other benefits. The cost of coverage is based upon the employee's age and base salary and will be deducted from the employee's paycheck on an after-tax basis after flex dollars have been applied.

In general, an employee will be permitted to make insurance coverage elections when he or she first becomes eligible for coverage. These elections will remain in effect until the employee is no longer eligible or makes a change. In most cases, changes to a coverage election will only be permitted during the annual open enrollment period held in October or November of each year. Changes, once approved, are usually effective January 1. Certain limited exceptions apply for individuals who experience a change in status in accordance with IRS guidelines for plans operating in accordance with §125. A Change in Status brochure has been developed to explain some of the situations that are considered a qualified change in status. This brochure is available on the Human Resources web site on the Intranet.

top

Employees who initially elect basic LTD coverage who later wish to increase coverage will be required to submit proof of good health to the insurance carrier. The carrier will determine whether to approve the additional coverage.

Employees who are disabled should file a claim for LTD benefits as soon as it may be determined that they will be unable to work for medical reasons for more than 90 consecutive days. Claim forms may be obtained from Human Resources Benefits.

Employees are encouraged to refer to the SPD booklets for this plan for additional information about how specific situations will be handled, including the calculation of the amounts payable under the policy and to find out more about exclusions and limitations of the plan. Claims are processed by the insurance company. They will advise employees directly of their decision via an Explanation of Benefits (EOB). Employees may appeal a decision made by the insurance company by following the instructions included in the SPD for the LTD plan.

Employees on LTD will not accrue PTO or holiday pay while off work but will remain eligible for special pension benefits in accordance with the pension plan provisions. Medical and dental coverage may be continued in accordance with COBRA. For additional information about COBRA insurance, please refer to the medical and/or dental SPD booklet. In some cases, certain special continuation provisions apply to individuals who are covered for life insurance. Employees are encouraged to refer to the SPD booklet for life insurance to see if these provisions are applicable to them.

While on LTD, an employee may also be concurrently on a leave of absence and should refer to the Leave of Absence Section of these Guidelines for additional information on these leaves. Except for any special return to work provisions contained in these Guidelines for a concurrent leave, employees on LTD are not guaranteed employment upon release to return to work and/or the expiration of their LTD coverage. Returning employees are encouraged to apply for open positions for which they are qualified. However, if a successful placement cannot be found, employment will end upon expiration of their LTD coverage.

top

### 13.6 Health Care and Dependent Care Reimbursement Accounts

Reimbursement accounts can be an important part of an employee's benefits package and a key advantage of a flexible benefits program. They consist of flex-dollars left over after an employee has purchased his or her benefits and/or, if he or she chooses, pre-tax payroll deductions. A reimbursement account allows an individual to pay for certain out-of-pocket expenses for health care and dependent care on a tax-free basis. All Regular Full-time and Special Projects employees and benefits eligible Part-time Faculty are eligible to participate in these accounts on the first day of the month following one month of benefits eligible service. An employee may elect to contribute any amount up to $3,000 per calendar year for the health care reimbursement account and $5,000 for the dependent care reimbursement account. Contributions to the accounts are made on a pre-tax basis and taken directly from each paycheck. An employee then uses the accounts to reimburse him or herself for eligible health care and dependent care expenses with tax-free money. There are two types of reimbursement accounts:

top

### Health Care Reimbursement Accounts

In general, this account can be used for items not covered in full or at all by an employee's medical and dental insurance. Some examples of items to be considered include annual deductibles, office visit co-payments, prescription drug co-payments, eyeglasses and contacts. Not all expenses are eligible, so it is important that an employee checks the list of eligible expenses before he or she enrolls. Even if an employee has elected to waive the AIC's medical and/or dental plans, he or she may still participate in the reimbursement accounts. An employee may also submit unreimbursed eligible medical and dental expenses for his or her spouse or dependent children, even if an employee does not cover these individuals on his or her AIC insurance.

### Dependent Care Reimbursement Accounts

These accounts can be used for eligible dependent care expenses that are incurred and are necessary to allow an employee to be able to work. Some examples of items to be considered include day-care facilities and in-home companion services for anyone who is claimed as a dependent on an employee's federal income tax return.

In general, an employee will be permitted to make a reimbursement account election when first eligible for coverage. These elections will remain in effect until the end of the calendar year, or during the year if the employee becomes ineligible to participate due to a change in employment classification or reduction in hours. Employees are required to make a new election to participate each year during the Annual Open Enrollment period held in October or November of each year. Changes are effective January 1. Certain limited exceptions apply for individuals who experience a change in status in accordance with IRS guidelines for plans operating in accordance with §125. A Change in Status brochure has been developed to explain some of the situations that are considered a qualified change in status. This brochure is available on the Human Resources web site on the Intranet.

It is important to understand that any balance left in an individual's account at the end of the year must be forfeited according to IRS regulations. It is therefore important for an employee to estimate reimbursable expenses carefully prior to enrolling in the program. In certain cases, an employee will receive a greater benefit from taking a federal tax credit instead of participating in the dependent care spending account. It is recommended that interested employees consult with a tax advisor before making a decision to participate in this program.

Employees are encouraged to refer to the insurance company's Reimbursement Account Brochure (which can be obtained in Human Resources) or the insurance company's web site for additional information. In addition, these sources will also provide information on how specific expenses will be handled, including information about eligible and ineligible reimbursement account expenses and IRS limits on contributions. Claims are reviewed by a third party administrator who will advise an employee directly of their decision and issue reimbursement checks accordingly.

*top*

### 13.7 Short-Term Disability (Effective 02/01/2004)

The objective of the Short-Term Disability (STD) Plan is to provide a source of income to employees who are disabled and unable to work for more than fourteen consecutive calendar days until they are no longer disabled -- up to a maximum of 11 weeks. All Regular Full-time employees are eligible after six months of service in an eligible classification and status.

Benefits may commence on the fifteenth consecutive calendar day of a disability. Employees are required to use ten PTO days, or stored sick time if available, prior to the start of STD.

Eligibility Requirements:

| Length of Full-time Service * | Short Term Disability Benefit |
|---|---|
| Six months but less than 10 years | 60% |
| 10 years or more | 70% |

\* As of the first day of disability

Employees who are disabled should file a claim for STD benefits as soon as it may be determined that they will be unable to work for medical reasons for more than fourteen calendar days. Completed claims must be received in Human Resources no later than ten days following the first date of disability. Claim forms may be obtained from the Human Resources Benefits office. A Human Resources Benefits specialist will tell an employee if his or her claim has been approved.

Periodic updates, including updated medical information from the attending physician, will be required at least every 30 days for absences of greater than one month. An employee will not receive STD if the medical certification does not support the employee's claim of disability as determined by the AIC. In certain cases, it may be necessary to submit to an AIC-paid Independent Medical Examination (IME). If an employee refuses an IME, or if the IME does not support the employee's claim of disability, STD benefits will not be paid. STD benefits will end when the employee is deemed to be no longer disabled and in no case will extend beyond the 11-week period, regardless of whether the employee qualifies for benefits from the LTD plan.

*top*

The maximum benefit is 11 weeks per illness or injury. If, after a period of disability for which STD benefits were paid, the employee resumes his or her regular job on a full-time basis for one month or more, any subsequent absence from work will be treated as a new period of disability.

STD will be calculated on the employee's base salary. Base salary means the employee's regular pay from the AIC excluding overtime or any supplemental forms of compensation. If an employee's base salary changes during a period of STD, STD payments will be adjusted accordingly.

STD can often run concurrently with a FMLA leave (see Section 12.5 for additional information about FMLA leave). Employees on STD cannot supplement their STD with PTO. However, PTO may be used in lieu of STD. Employees who have stored sick time can supplement their STD so that they may be able to receive 100% pay during their period of disability.

If approved, STD will be paid through the normal payroll process according to the employee's standard pay schedule. If an AIC-observed holiday occurs during a period of STD, the employee will receive holiday pay in lieu of STD for that day, and will deplete the number of STD days available to the employee by one day. During a period of STD, all normal payroll deductions will continue, as will benefits and PTO accrual.

### 13.8 Retirement Benefits

The AIC's pension plan is provided without cost to all eligible employees. In general, the pension plan covers employees after they have been employed for one year and have completed at least 1,000 hours of work during the first year or any anniversary year thereafter. The plan is a defined benefit pension plan which generally provides a monthly pension benefit upon retirement that continues over the remainder of the participant's lifetime and over the participant's surviving spouse's lifetime, if married. Other optional forms of payment are available, some of which provide for benefits to a beneficiary upon the death of the retiree. Each form of payment results in a different monthly benefit amount based upon actuarial calculations. The amount of an employee's pension is determined based upon the employee's service, hours, earnings, age at retirement, and estimated social security benefits.

Generally, an employee is entitled to (vested in) his or her pension plan benefit after five years of AIC service as defined in the pension plan. Vested participants may commence their benefits at age 65 (age 62 for participants hired before July 1, 1982.) Or a vested participant with 10 or more years of service may retire with a reduced pension as early as age 55. Employees with 10 or more years of service can retire at age 62 with no reduction in benefits.

*top*

If an employee is vested and dies before age 65 while still actively employed by the AIC, his or her spouse will be entitled to a lifetime monthly pension.

If an employee becomes disabled after five years of service and receives benefits under the LTD plan or social security disability, he or she will qualify for a disability retirement pension starting at the later of when his or her LTD benefits stop or the date he or she reaches normal retirement age.

Active employees who leave employment with the AIC and immediately commence early retirement pension benefits, as defined in The Art Institute of Chicago Pension Plan, are eligible to continue medical and/or dental coverage until age 65. These early retirees pay a portion of the cost of coverage based upon their years of service as of the date of retirement. The cost of coverage is subject to change annually on January 1. In addition to medical and/or dental coverage these individuals will receive a term life insurance policy in the amount of $15,000. This life insurance coverage ends upon attainment of age 65.

Employees are encouraged to refer to the SPD booklet for this program for additional information about the eligibility rules, how benefits are calculated, forms of payment, vesting and other provisions. Questions about the pension plan should be directed to Human Resources Benefits.

Certain individuals are not eligible for participation in the Pension Plan including employees in a Telefund position, any employee who is supported by a gift, grant, or fellowship, interns, retail or office support assistants, or any Faculty of the SAIC. For additional information about excluded individuals and positions and eligibility requirements, please refer to the SPD booklet for this plan.

### 13.9 Tax Sheltered Annuity

Regular Full-time employees who wish to save on their own for retirement can do so by making voluntary contributions to a tax-sheltered annuity in accordance with §403(b) and §403(b)(7). These voluntary contributions are deducted from each paycheck on a pre-tax basis.

Employees choose how their contributions are invested, selecting from the following vendors:

* TIAA-CREF
* Equivest (Equitable)
* MetLife

*top*

Any earnings on contributions are sheltered from taxes until withdrawn from the tax-deferred annuity.

Contribution maximums established by the IRS limit how much an employee can contribute in any given calendar year. In general, contributions made to a tax-sheltered annuity cannot be withdrawn prior to age 59 ½ without IRS penalty. All contributions and earnings are taxable as ordinary income at the time they are withdrawn.

Information on making contributions to a tax-deferred annuity and the salary reduction form required to start contributions is available on the Human Resources web site on the Intranet.

*top*

### 13.10 Long Term Care

The AIC offers eligible employees the opportunity to purchase group Long Term Care insurance. Long Term Care insurance can be purchased for the employee, or for the employee's spouse or domestic partner, as well as for the employee's parents, grandparents and in-laws. This program provides a daily benefit that can be applied to services that may be required at some point, including nursing home care, adult day care, home health care, etc.

Eligible employees include Regular Full-time and Special Projects employees and Faculty. The benefits available and costs involved are described in greater detail in a booklet available from Human Resources Benefits. Employees who do not enroll when first eligible must submit proof of good health to the insurance carrier. The insurance carrier will determine if coverage will be approved.

### 13.11 Employee Assistance Program

On occasion, many of us may experience a serious personal problem that affects our ability to work and perform at normal levels. This can result from such matters as marital difficulties, financial pressures, legal situations, childcare problems, depression, substance abuse, and other non-work related issues. To assist our employees in overcoming these difficulties, the AIC provides a benefit called the Employee Assistance Program (EAP). All AIC employees are eligible to take advantage of this program. The EAP offers a counseling and referral service to help an employee and/or members of his or her immediate household identify the problem and suggest a solution. The EAP is a confidential service – the AIC will not know who has used it, or the nature of that employee's issues. An employee may call for assistance 24 hours a day, seven days a week at 1/800-554-6931. In many cases, the employee's cost for using the service is free. If there will be a charge, the EAP provider will let the employee know in advance so he or she can decide whether to continue with the services. In addition, the EAP can help AIC managers with employee problems and management concerns. For general information about the program, contact Human Resources Benefits.

*top*

The Collection | Exhibitions | Calendar | Visit | Families | Education | Libraries | About Us | Members | Shop | Image Rights

© 2006 The Art Institute of Chicago. 111 South Michigan Avenue, Chicago, Illinois, 60603-6404.
Terms and Conditions. | All text and images on this site are protected by U.S. and international copyright laws. Unauthorized use is prohibited. | Site Credits.

08CV4023
JUDGE CONLON
MAGISTRATE JUDGE ASHMAN

PH

# EXHIBIT C

# JOB DESCRIPTION: MUSEUM SECURITY MANAGER

**Title:**          Security Manager – Special Events and Activities
**Reports To:**     Assistant Director, Museum Operations – Day Shift
**Supervision:**    Museum Security Guards/Officers assigned to escorts and special events
**Grade:**          6
**FLSA:**           Exempt

*IN ADDITION TO resume present position*

## POSITION SUMMARY:

Responsible for scheduling security managers and guards/officers for early and late hour special events, contractor escorts, special assignments, etc. Assists the Assistant Director in deciding on special events, escorts, manpower levels, deployment and related budgets. Maintains liaison between other museum departments and the Department of Protection Services concerning security requirements and instructions.

## PRIMARY DUTIES AND RESPONSIBILITIES:

1) **Supervise security guards/officers assigned to special events and contractor escorts.**
   - Schedule on a day to day basis security managers and guards/officers for early morning and/or late evening activities that occur prior to the opening or after the closing of the museum, i.e. special events (both internal and external client events), contractor escorts, VIP visits, special duties, early morning starts, etc.
   - Oversee staffing of escort guards working hours, planned vacations, and unplanned absences.
   - Monitor escort guards work performance, conduct annual evaluations and employee disciplinary matters.
   - Maintain employee files on discipline, commendations and conversations regarding performance, attendance and behavior.
   - Interview/select new security personnel interested in escort guard vacancies.
   - Address staff concerns.
   - Distribute information both verbal and written to individual Security Officers as needed.

2) **Determine needed manpower for special events and contractor escorts.**
   - Assign proper orders and instruction to security managers and guards/officers, along with proper deployment.
   - Estimate security cost and communicate said cost to the Payroll Supervisor as well as the museum department requesting these services.

3) **Keep track of all day shift managers and guards/officers Paid Time Off (PTO) and Holidays.**
   - Issue and process PTO requests.
   - Assist Payroll Supervisor to ensure security guards/officers are given credit and paid for time off.
   - Maintain PTO calendar for day shift managers and guards/officers.
   - Maintain file on all transactions.

4) **Work with scheduling supervisor to ensure proper amount of guards/officers are scheduled to work during normal museum hours.**
   - Assist in scheduling guards/officers to work on day off, overtime, etc.

5) **Issue on daily basis a "Last Minute Memo" (a document that is issued to Security Controls, Security Panel, all DoPS Directors and Managers, Payroll Supervisor and detailed Security Guards/Officers).**
   - The memo states activities, events, detailed orders, etc. that the DoPS needs to be aware of that take place each day, including any action or duties that DoPS might be responsible for. This is considered DoPS "marching orders".

6) **Works special events AM and PM as scheduled.**

7) **Perform other duties as assigned.**

## MINIMUM QUALIFICATION.

- College degree preferred
- Must have at least 2-5 years working experience in security industry
- Experience in staff management required
- Ability to manage challenging visitors and employees
- Proven ability to think and make appropriate decisions/judgements on his/her own
- Ability to respond appropriately to emergencies, ad-hoc situations and work under pressure
- Must have strong verbal and written skills, and good interpersonal skills
- Excellent public relations and diplomatic skills is required
- Must be computer literate and proven knowledgeable in Microsoft Office applications/programs
- Good organizational skills and ability to prioritize work
- Ability to address and resolve conflicts
- Experience in cultural property protection is a plus

# EXHIBIT D

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 440-2007-00166 |

| **Illinois Department Of Human Rights** | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Craig  Johnson | (815) 459-2464 | 01-06-1948 |

| Street Address | City, State and ZIP Code |
|---|---|
| 4105 Rigby Road, Crystal Lake, IL 60012 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **ART INSTITUTE OF CHICAGO** | 500 or More | (000) 443-3500 |

| Street Address | City, State and ZIP Code |
|---|---|
| Michigan At Adams Street,  Chgo, IL 60603 | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 09-15-2006 | 09-15-2006 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began working for the Respondent in February 1987.  My most recent position was Security Manager.  On or about September 15, 2006, I was employed with the Respondent's reason being that I had failed to follow proper procedures regarding an employee's complaint about another employee.

I believe I have been discriminated against because of my age 58, (date of birth: January 6, 1948) in violation of the Age Discrimination in Employment Act of 1967, as amended.

OCT 1 0 2006

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | |
| Oct 10, 2006 _____ *Charging Party Signature*  *Date* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

# EXHIBIT E

EEOC Form 161-B (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Craig Johnson**<br>**4105 Rigby Road**<br>**Crystal Lake, IL 60012** | From: **Chicago District Office**<br>**500 West Madison St**<br>**Suite 2800**<br>**Chicago, IL 60661** |

**CERTIFIED MAIL: #7000 0600 0022 1012 6245**

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2007-00166** | **Amy Burkholder,**<br>**Investigator** | **(312) 353-8906** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*John P. Rowe* (signature)        4/17/08

**John P. Rowe,**
**District Director**

*(Date Mailed)*

Enclosures(s)

CC:    **ART INSTITUTE OF CHICAGO**

# EXHIBIT F

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 440-2007-01942 |

| Illinois Department Of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Greg P. Cahillane | (586) 498-9507 | 11-11-1953 |

| Street Address | City, State and ZIP Code |
|---|---|
| 24684 Lambrecht Avenue, Eastpointe, MI 48021 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| ART INSTITUTE OF CHICAGO | 500 or More | (312) 443-3561 |

| Street Address | City, State and ZIP Code |
|---|---|
| Michigan & Adams St, Chgo, IL 60603 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☒ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 09-15-2006 | 09-15-2006 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by the Respondent on June 1, 1987. My most recent position was Security Manager. On September 15, 2006 I was discharged. Respondent has discharged several security managers over the age of 40 during the past year.

I believe I was discriminated against because of my age, 52 (DOB: 11/11/53), in violation of the Age Discrimination in Employment Act of 1967, as amended.

RECEIVED EEOC
JAN 1 8 2007
CHICAGO DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| X 1/9/07    X  Greg Cahillane<br>Date       Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EXHIBIT G

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: Greg P. Cahillane<br>24684 Lambrecht Avenue<br>Eastpointe, MI 48021 | From: Chicago District Office<br>500 West Madison St<br>Suite 2800<br>Chicago, IL 60661 |
| --- | --- |

**CERTIFIED MAIL: #7000 0600 0022 1012 6238**

☐   *On behalf of person(s) aggrieved whose identity is*
    *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| 440-2007-01942 | Amy Burkholder,<br>Investigator | (312) 353-8906 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐   More than 180 days have passed since the filing of this charge.

☐   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

*John P. Rowe*    4/17/08

**John P. Rowe,**
**District Director**

*(Date Mailed)*

cc:     **ART INSTITUTE OF CHICAGO**

# EXHIBIT H

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 440-2007-00282 |

| Illinois Department Of Human Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Albertine Conell** | **(312) 842-8072** | **05-06-1945** |

| Street Address | City, State and ZIP Code |
|---|---|
| **2605 S. Indiana Ave, #1801, Chicago, IL 60616** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **ART INSTITUTE OF CHICAGO** | **500 or More** | **(312) 443-3600** |

| Street Address | City, State and ZIP Code |
|---|---|
| **125 E. Monroe, Chicago, IL 60604** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☒ AGE   ☐ DISABILITY   ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **03-20-2006**   Latest **03-20-2006**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began my employment with Respondent on October 8, 1984, and my most recent position was Museum Security Manager. On March 20, 2006, I was discharged. Respondent has discharged several other older managers this year.

I believe that I have been discriminated against based on my age, 61 (DOB 5/6/45), in violation of the Age Discrimination in Employment Act of 1967, as amended.

OCT 1 3 2006

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Oct 13, 2006**         X  *Albertine Conell*<br>Date                          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

# EXHIBIT I

EEOC Form 161-B (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  **Albertine Conell**
2605 S. Indiana Ave
#1801
Chicago, IL 60616

From:  **Chicago District Office**
500 West Madison St
Suite 2800
Chicago, IL 60661

**CERTIFIED MAIL: #7000 0600 0022 1012 6221**

☐  *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2007-00282 | Amy  Burkholder,<br>**Investigator** | **(312) 353-8906** |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII or the ADA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a state claim may be different.)

☐  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☒  The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice.  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought *in federal or state court within 2 years (3 years for willful violations)* of the alleged EPA underpayment.  *This means that **backpay due for** any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.*

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*John P. Rowe*                  7/17/08

Enclosures(s)

John P. Rowe,
**District Director**

*(Date Mailed)*

cc:      **ART INSTITUTE OF CHICAGO**