UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| BERNARD BERGER, | ) |
| CRAIG JOHNSON, | ) |
| GREGORY CAHILLANE, and | ) |
| ALBERTINE CONELL, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) 08 C 4023 |
| v. | ) |
|  | ) Judge George M. Marovich |
| THE ART INSTITUTE OF CHICAGO, | ) |
|  | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Bernard Berger ("Berger"), Craig Johnson ("Johnson"), Gregory Cahillane ("Cahillane") and Albertine Conell ("Conell") filed this suit against defendant the Art Institute of Chicago ("AIC" or the "Art Institute"). Plaintiffs assert that the Art Institute terminated their employment in violation of federal law. The Art Institute has filed two motions for summary judgment. In the first motion, the Art Institute seeks summary judgment with respect to Berger's claims that his employment was terminated in order to interfere with his rights to benefits under the Employee Retirement Income Security Act ("ERISA"). In the second motion, the Art Institute seeks summary judgment on Johnson's, Cahillane's and Conell's claims that he or she was terminated in violation of ERISA and the Age Discrimination in Employment Act. For the reasons set forth below, the Court grants both motions for summary judgment.

**I.   Background**

The following facts are undisputed unless otherwise noted.[1]

---

[1] Before the Court discusses the facts, it reiterates the importance of complying with Local Rule 56.1. Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. As the Court notes on its website (and has mentioned in multiple opinions), the Court enforces Local Rule 56.1 strictly.

Defendant AIC is a not-for-profit corporation made up of two divisions: the School of the Art Institute of Chicago and the Art Institute of Chicago Museum. The four plaintiffs in this case worked for the Department of Protective Services–the department within the Museum that is responsible for the safety and security of the museum patrons and the exhibits.

During the relevant time period, the AIC employed Ray Van Hook ("Van Hook") as the Executive Director of the Department of Protective Services. Van Hook had final approval over employment terminations and suspensions. In addition, Van Hook was in charge of his department's budget.

When Van Hook became Executive Director at some point in 2002, he was told to decrease his 2003 budget by 15%. His budget included, among other things, salaries, wages and benefits. He made the cuts by not filling vacancies and by cutting overtime and training expenses. In addition, he outsourced portions of the security function to Securitas.

---

Facts that are argued but do not conform with the rule are not considered by the Court. In addition, where one party supports a fact with admissible evidence and the other party denies the fact without citation to admissible evidence, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). This, however, does not absolve a party of its initial burden of putting forth admissible evidence to support its facts. Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court. For example, in ¶ 39 of defendant's statement of facts with respect to Berger, defendant stated, "Neither Skimina nor Van Hook took Plaintiff's pension or health benefits into account when making the decision to terminate his employment." The fact was supported by affidavits signed by Skimina and Van Hook. Plaintiff denied the fact without citation to any evidence. Accordingly, the Court deemed ¶ 39 admitted.

The Court also notes that plaintiffs filed more than the 40 statements of fact allowed by Local Rule 56.1. Although defendant would like the Court to ignore the additional facts, this Court declines and notes that plaintiffs have the burden of proof and that their attorney was asserting individual claims of four plaintiffs.

**Benefit plans at the AIC**

The Art Institute offered two employee benefit plans that are relevant to plaintiffs' claims.

Each of the four plaintiffs participated in the Art Institute's Pension Plan. The Pension Plan's Summary Plan Description states, among other things, "If you feel you are being denied a pension or you disagree with the amount of your pension benefit, you . . . may file a claim with the Art Institute." The Summary Plan Description goes on to state, "You must exhaust the Plan's appeal procedures prior to seeking any other form of relief." During plaintiffs' tenure with the Art Institute, the plan was a defined benefit plan. New employees hired after January 1, 2007 became participants not in the defined benefit plan but in a new defined contribution plan.

The Art Institute also offered a welfare benefit plan (the "AIC Health Insurance Plan"), and that plan is relevant to one of Berger's claims. The welfare plan requires exhaustion of plan appeal procedures if the employee "believes that he or she is being denied participation in the Plan or enrollment in any Benefit Program." At some point in 2005 (either January or July), the AIC Health Insurance Plan became self-insured.

**Berger**

The AIC hired Berger in 1977. His first position was as a Safety Coordinator, and his last position at the AIC was as a Fire Protection Specialist. As such, Berger was responsible for performing maintenance inspections of fire equipment, responding to accidents, training others on how to use fire equipment and providing CPR and first-aid training.

Berger participated in the AIC Health Insurance Plan, and his wife and son were beneficiaries under the plan. From September 2002 to September 2003, Berger's son incurred

approximately $53,000 worth of medical expenses covered by the plan. In 2004, Berger's wife incurred approximately $100,000 worth of medical expenses covered under the plan. In 2005, Berger's wife incurred fewer medical expenses than she had in prior years.

By 2001, Berger reported to Margaret Skimina, who was the Associate Director of Fire Protection and Environmental Health and Safety at the Art Institute. Skimina, in turn, reported to Ray Van Hook ("Van Hook"), who was the Executive Director of the Department of Protective Services. Skimina, as Berger's supervisor, reviewed Berger's performance for the period of April 2001 to March 2002. In that review, she rated Berger as meeting expectations in most areas, but she rated Berger as failing to meet expectations in a couple of areas. In particular, Skimina told Berger to take computer training, to take a typing class, to document his verbal conversations and to take fire-safety courses.

About a year later, Skimina reviewed Berger's performance for the period of March 2002 to May 2003. Skimina rated Berger as not achieving expectations in certain areas, such as adaptability, analytical skills, communication skills and organization skills. Once again, Skimina told Berger to take a typing class, a computer class and an advanced fire systems class and to document his verbal conversations.

Skimina reviewed Berger's performance again in November 2004. By then, Berger had still not taken a typing class or the fire safety class. Berger could not find a typing class to take, and Skimina did not respond to his question of what fire class to take. During the years when Berger failed to take the typing class and the fire safety class, he worked on several large projects in addition to his usual workload. These projects included renovating the Ferguson wing, adding new fire protection systems to elevators and the relocation of storage units within

the Art Institute.  When Berger asked to work overtime, his requests were denied.  Despite this, Skimina continued to rate Berger's performance as not achieving expectations in several areas.  In the November 2004 evaluation, Skimina recommended a performance improvement plan for Berger.

On November 5, 2004, Skimina and Van Hook met with Berger and explained the performance improvement plan.  Among other things, they informed Berger that if he did not improve his performance, his employment would be terminated.  About three months later, Skimina met with Berger about his performance.  Skimina told Berger that she did not believe he had achieved all of the targets, but Skimina gave him more time.  Berger understood that Skimina was not satisfied with his performance.

Berger continued to work for the AIC.  At some point in September 2005, Berger removed tickets to a White Sox game from Skimina's office, because she was sick and unable to use the tickets.  About two weeks later, Skimina wrote Berger a memorandum about her continued dissatisfaction with his performance.  In the memo, Skimina told Berger that he was not documenting his activities sufficiently or completing tasks in an efficient manner.  Berger told Skimina he would try to improve his performance.

In October 2005, Skimina was drafting Berger's annual review.  Concluding that Berger's performance was still not acceptable, Skimina recommended to Van Hook that Berger's employment be terminated.  Van Hook agreed.  It is undisputed that neither Skimina nor Van Hook took Berger's pension or health benefits into account when making the decision to terminate his employment.  Skimina informed Berger that his termination was due to

performance and, later, provided a written explanation. Berger then met with Van Hook to ask for his job back, but Van Hook did not change his decision to terminate Berger's employment.

Since his termination, Berger has received his vested pension payments. He believes he would be entitled to a greater payment had he continued working for the Art Institute. Berger still participates in the AIC Health Plan for retirees, although he has not added his wife or son as a beneficiary.

**The plaintiffs who worked as Security Managers**

The other three plaintiffs, like Berger, worked in the Department of Protective Services. Unlike Berger, however, plaintiffs Cahillane, Conell and Johnson were each working as Security Managers at the time of their respective discharges.

One of Van Hook's objectives when he became Executive Director was to professionalize the Department of Protective Services. To that end, the AIC changed the position of Security Supervisor to the position of Security Manager. At the same time, the position went from being an hourly position to a salaried position exempt from the overtime requirements of the Fair Labor Standards Act. The AIC gave the new Security Managers a raise and provided them training on supervisory fundamentals, customer service and performance management. The AIC considered the change from Security Supervisor to Security Manager a promotion. The new Security Managers seem to have considered the change a way for the AIC to avoid paying overtime. The change is not at issue in this suit.

As of the start of 2006, the AIC employed ten individuals as Security Managers. Cahillane was 53 and had 18 years of service. Conell was 61 and had 21 years of service.

Johnson was 58 and had 18 years of service. The names, ages and years of service of the other seven Security Managers were as follows: Filipe Aguilar, Jr. 53, 2; Curtis Harrell 43, 0; Stefan Kwiatkowski 56, 29; Floree Lesure 48, 11; Oswald Nyepan 55, 19; Guyla Von Moore 68, 20; David Walksler 39, 19.

Conell, Cahillane and Johnson were each assigned day shifts. During the day, four Security Managers were each primarily responsible for one quadrant of the Art Institute. Their duties included guarding their posts, monitoring the area, checking perimeter access points to ensure they were secured or open as necessary, responding to calls for assistance, responding to unsafe conditions and making appropriate reports of incidents.

**Cahillane**

Cahillane was working as a Security Manager at the AIC on July 17, 2006 when he received a call to investigate a pickpocketing incident at the gift shop. Cahillane asked the guards in the gift shop if there were any problems. Each said no. Cahillane told one of the guards that if there was a problem, the guard should call a Security Manager. Cahillane left for the day. The next day, Van Hook informed Cahillane that the victim was an AIC employee. Van Hook told Cahillane that he should not have left without investigating further. Van Hook told Cahillane that leaving showed a tremendous lack of judgment and that future disregard of his duties would result in the termination of Cahillane's employment.

A few months later, on September 6, 2006, Cahillane was on duty when the AIC hosted an event. Cahillane was the Eastside Security Manager, and it was his job to obtain a proper count of the number of guests who attended the event. Cahillane delegated the count to an AIC guard who was later reassigned to another post within the Art Institute. When the coordinator

called Cahillane at 4:00 to obtain the count, she could not find him and was told Cahillane had left for the day. A guard provided a count that the AIC believes was inaccurate. Van Hook met with Cahillane on September 14, 2006 to discuss the issue. Van Hook told Cahillane that the coordinator was very upset that the count was inaccurate and that it made the Art Institute look bad. At the meeting, Cahillane admitted to Van Hook that he had left early on September 6. At his deposition, Cahillane testified that he could not remember whether or not he had left early on September 6, but Cahillane believed Van Hook was genuinely upset with him. Van Hook terminated Cahillane's employment for failure to complete the count.

The AIC replaced Cahillane with Corey Burage, who was 37 years old at the time. While Cahillane was employed by the AIC, he never heard Van Hook, Sullivan or Tarleton make derogatory comments about or toward older employees. Cahillane also never heard any comments that would lead him to believe they disfavored older workers. Van Hook did not know when Cahillane had planned to retire and did not know the amount of Cahillane's pension benefit. Cahillane is vested in certain pension benefits, which he plans to collect when he turns 55 years of age.

**Conell**

The Security Managers were reminded several times about the importance of responding to calls from guards. For example, in December 2005, the Assistant Director of Operations notified the Security Managers that they needed to do a better job of responding to calls from guards. In late February 2006, the Assistant Director of Operations told the Security Managers to respond "immediately" if a guard called for help. Despite these warnings about responding to

guards, the incident which lead to Conell's discharge involved her failure to respond to a call from a guard.

On March 10, 2006, Conell was assigned as the Westside Manager, and her shift began at 9:00 a.m. Connell arrived early and was sitting in a room with Nyepan, another Security Manager, at 8:56 a.m. when a call came over the radio. The caller asked for the Westside Manager to assist an employee. Conell told Nyepan, "Nyepan, I don't start until 9:00." Conell believed that Nyepan should have responded to the call. At 9:00, Conell called the control operator and learned that another Security Manager, Dave Walksler, had responded to the call.

When Van Hook learned that Conell had failed to respond to the call, he spoke to her. Conell informed Van Hook that she had not responded because her shift had not started. Van Hook suspended Conell. Ten days later, after conducting an investigation, Van Hook terminated Conell's employment. Van Hook was particularly troubled by the fact that Conell had not known what the call was about when she decided not to answer it.

The AIC replaced Conell with Todd Hengsteler, who was 44 years old at the time. While Conell was employed by the AIC, she never heard Van Hook, Sullivan or Tarleton make derogatory comments about or toward older employees. She also never heard any comments that would lead her to believe they disfavored older workers. Van Hook did not know when Conell had planned to retire and did not know the amount of Conell's pension benefit. Conell has begun collecting her pension under the AIC plan.

**Johnson**

Like Cahillane and Conell, Johnson was employed by AIC as a Security Manager. On July 31, 2006, Johnson was the first day-shift Security Manager to arrive at the AIC. One of the

tasks of the first-to-arrive Security Manager was to unchain the fire doors in his or her respective area. On July 31, 2006, Johnson failed to unchain the fire doors, and this fact became apparent during a fire drill later that day when several employees became trapped between an inner door and a fire exit. When Associate Director Leonard Sullivan ("Sullivan") spoke to Johnson about the incident, Johnson admitted that he failed to unchain the doors. Sullivan emphasized the seriousness of failing to unchain the doors and reminded Johnson that people could be injured in the event of an actual fire. Johnson believed that other Security Managers on duty that day, such as Samuel Nelson (then, 42 years olds), should also have been lectured or written up. Johnson was told that similar negligence in the future would result in the termination of his employment.

Termination of Johnson's employment occurred less than three months later. The incident that lead to Johnson's discharge occurred on September 11, 2006. On that day, a Securitas security guard, Chester Fischer ("Fischer"), told Johnson that an AIC janitor had hassled him about his girlfriend. Johnson twice asked Fischer if he wanted Johnson to report the incident to Fischer's boss or to discuss the matter with the janitor. Fischer declined. Johnson did not fill out an incident report (which was required for incidents that were out of the ordinary) or inform his supervisor about his conversation with Fischer.

When Johnson's immediate supervisor, Monique Tarleton ("Tarleton") learned of the incident from Fischer's Securitas supervisor, Tarleton told Johnson she was going to discuss it with Sullivan. Ultimately, Tarleton recommended to Van Hook that Johnson's employment be terminated for failing to report what could have been a serious situation. Van Hook agreed and informed Johnson on September 15, 2006 that his employment was terminated. Johnson admits

that discipline was appropriate for failing to fill out an incident report on September 11, 2006. Johnson felt, however, that a reprimand or suspension was more appropriate than discharge.

The AIC replaced Johnson with Theresa Steenwyk, who was 48 years old at the time. While Johnson was employed by the AIC, he never heard Van Hook, Sullivan or Tarleton make derogatory comments about or toward older employees. Neither Van Hook nor Tarleton knew when Johnson had planned to retire or the amount of Johnson's pension. Johnson is still entitled to an AIC pension, although Johnson thinks it would have been greater had he continued to work at the AIC.

## II. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III. Discussion

### A. Plaintiff's ERISA claims arising out the pension plan

In Counts I, III, V and VII, respectively, plaintiffs Berger, Johnson, Cahillane and Conell claim that he or she was discharged in order to interfere with his or her rights under the pension plan in violation of § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. Each plaintiff asserts that had he or she continued as an employee of AIC, he or she would have been entitled to a higher pension benefit.

ERISA § 510 makes it unlawful to discharge a participant or beneficiary of an ERISA plan "for exercising any right to which he is entitled" under the plan. 29 U.S.C. § 1140. Section 510 also "protects employees against dismissal by employers who seek to limit costs of . . . benefit plans by preventing the use of such benefits." *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998). To prevail under § 510, "plaintiffs must establish more than a loss of benefits; they must demonstrate that their employers terminated them with the specific intent of preventing or retaliating for the use of benefits." *Lindemann*, 141 F.3d at 295. "No violation will arise where the deprivation was simply the consequence of a decision that had the incidental effect of affecting an employee's benefits. *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005). To make out a *prima facie* case under § 510, a plaintiff must show that (1) he is in the protected class; (2) he was qualified for his position; and (3) his employment was terminated under circumstances that show the presence of the prohibited intent to retaliate or prevent the use of benefits. *Isbell*, 418 F.3d at 796.

Defendant argues that plaintiffs cannot pursue their § 510 claims because they failed to exhaust the plan's appeals process. A district court has the discretion to require a claimant to exhaust his administrative remedies under the benefit plan before proceeding in federal court.

*Powell v. AT&T Comm. Inc.*, 938 F.2d 823, 825-826 (7th Cir. 1991); *Kross v. Western Electric Co., Inc.*, 701 F.2d 1238, 1246 (7th Cir. 1983). In *Kross*, the Seventh Circuit said:

> [W]e conclude that requiring [plaintiff] to exhaust his administrative remedies prior to bringing a lawsuit for interference with the vesting of his service pension under § 510 of ERISA, 29 U.S.C. § 1140, regardless of whether or not such administrative remedies can reinstate him in his job, would not be a 'useless gesture' and would support the important public policy of encouraging private rather than judicial resolution of disputes under ERISA.

*Kross*, 701 F.2d at 1246.

With respect to the pension plan, the Court concludes that the plaintiffs should have exhausted their administrative remedies. Each plaintiff complains that his or her pension would have been higher had he or she not been discharged. The pension plan requires exhaustion where a beneficiary believes his pension should be higher. Accordingly, exhaustion is appropriate. None of the plaintiffs exhausted his or her administrative remedies, so the AIC is entitled to judgment as a matter of law on Counts I, III, V and VII.

Even if the plaintiffs had exhausted their administrative remedies, the AIC would still be entitled to summary judgment on these claims. No plaintiff can make out a *prima facie* case of § 510 discrimination with respect to the pension plan, because no plaintiff can show he or she was discharged under circumstances that suggest that AIC had the specific intent to interfere with his or her pension benefits. Van Hook did not know how much the AIC was contributing for plaintiffs' pension benefits and did not know when these plaintiffs intended to retire. True, the Art Institute cut its budget three years before these plaintiffs were discharged, but that does not mean it cost the Art Institute less money to make pension contributions for plaintiffs' replacements. True, too, the Art Institute stopped letting new employees into the defined benefit pension plan as of January 1, 2007, but these plaintiffs were replaced in 2006, which means their

-13-

replacements were eligible to join the same defined benefit plan from which these plaintiffs receive or will receive their pensions. Finally, no plaintiffs can show (as explained below) that the AIC's legitimate, non-discriminatory reasons for his or her discharge were pretextual.

Accordingly, AIC is entitled to judgment as a matter of law on Counts I, III, V and VII. The Court grants summary judgment to the Art Institute on Counts I, III, V and VII.

### B. Berger's ERISA claim arising out of the welfare plan

In Count II, Berger asserts that the AIC terminated his employment in order to interfere with his rights under the AIC Health Insurance Plan in violation of ERISA § 510.

Once again, AIC argues that Berger should have exhausted the plan appeals process before bringing his federal claim. The Court disagrees. The welfare plan requires exhaustion when a participant or beneficiary believes he "is being denied participation in the Plan or enrollment in the Benefit Program." Berger does not argue that he would have been entitled to greater health benefits had he not been discharged, so the Court does not see any benefit from exhausting the appeals process. Accordingly, the Court exercises its discretion not to require exhaustion with respect to the AIC Health Insurance Plan.

The Court next considers whether Berger has made out a *prima facie* case of § 510 discrimination. To do so, Berger must show that his employment was terminated under circumstances that suggest the presence of the prohibited intent to interfere with his welfare benefits. *Isbell*, 418 F.3d at 796. Although the case is close, the Court concludes that the circumstances do create a slight inference of retaliation, which is all the *prima facie* case requires. Berger's son incurred more than $53,000 worth of covered medical benefits during 2002 and 2003. Berger's wife incurred $100,000 worth of covered medical benefits during 2004 and a lesser amount in 2005. Although Berger was put on a performance improvement plan in

November 2004, three months later he was given additional time to improve his performance. The performance improvement plan was not mentioned again until September 2005, which happened to be two months after the AIC started self-insuring its medical benefits. The timing provides a slight inference that Berger's use of medical benefits (which AIC was, by then, paying for directly) was related to his termination.

AIC has put forth a legitimate, non-discriminatory reason for Berger's discharge: his performance was unsatisfactory. Berger has not put forth sufficient evidence that AIC's reason was pretextual. Berger put forth evidence that he had a lot of work to do and that he was not allowed to use overtime. It is not illegal, however, to expect employees to be efficient with work time. The desire for efficiency, furthermore, does not suggest that Skimina and Van Hook specifically intended to interfere with Berger's benefits. In addition, Berger was eligible to continue his and his family's medical benefits as part of the retiree health plan, which suggests that AIC had no reason to think it would save money by terminating Berger's employment. Most importantly, it is undisputed that Skimina and Van Hook did not consider Berger's use of medical benefits when they made the decision to terminate his employment. For these reasons, no reasonable jury could conclude that his employment was terminated in order to interfere with his welfare benefits.

AIC is entitled to judgment as a matter of law and is hereby granted summary judgment on Count II.

**B.     Johnson's ADEA claim**

In Count IV, Johnson claims that the AIC terminated his employment due to his age in violation of the Age Discrimination in Employment Act ("ADEA").

The Age Discrimination in Employment Act makes it "unlawful for an employer–(1) to fail or refuse to hire or to discharge any individual [who is 40 years old or older] . . . because of such individual's age." *See* 29 U.S.C. § 623(a)(1). A plaintiff may establish discrimination in violation of the ADEA either by putting forth direct evidence of discrimination or by following the indirect method under *McDonnell Douglas Corp. v. Green.*, 411 U.S. 792, 802 (1973). A statement can be "direct evidence of discriminatory intent where the statement was made around the time of *and* in reference to the adverse employment action." *Olson v. Northern FS, Inc.*, 387 F.3d 632, 635 (7th Cir. 2004) (emphasis added) (citing *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000)). Here, Johnson admits he never heard any age-related comments at the AIC.

Because Johnson provides no direct evidence of discrimination, he must follow the indirect method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The "burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It requires a plaintiff to show that he was discharged "under circumstances which give rise to an inference of unlawful discrimination" and the "standard is not inflexible" because facts vary in different cases. *Burdine*, 450 U.S. at 253 and n.6. To make out a *prima facie* case of discrimination in the termination context, a plaintiff must establish that (1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he was discharged; and (4) the employer either filled the position with a person not in the plaintiff's protected class or that a similarly-situated individual outside his protected class was treated more favorably. *Jennings v. Illinois Dep't of Corrections*, 496 F.3d 764, 767 (7th Cir. 2007); *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845-846 (7th Cir. 2007). Evidence of similarly-situated individuals is an essential element of the *prima facie* case, and, without it, defendant is entitled to judgment as a matter of law on a

plaintiff's discrimination claim. *Kriescher v. Fox Hills Golf Resort & Conf. Ctr.*, 384 F.3d 912, 915 (7th Cir. 2004).

If a plaintiff makes out a *prima facie* case of discrimination, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its decision." *Rudin*, 420 F.3d at 724. "If the employer does articulate such a reason, then 'the plaintiff must show by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination.'" *Rudin*, 420 F.3d at 724. "To do this, the employee must establish that the explanation is a lie, which permits a jury to infer that the tale has been concocted to conceal an unlawful truth. It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused, or otherwise benighted; none of those possibilities violates federal law. Poor personnel management receives its comeuppance in the market rather than the courts." *Yindee v. CCH Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) (internal citations omitted).

Here, Johnson makes out a *prima facie* case of age discrimination. Johnson is in a protected class (he is over the age of 40), was (the Court will assume) meeting his employer's expectations and was discharged. In addition, although he was replaced by someone outside of his protected class, his replacement was ten years younger, which suffices to create an inference of discrimination. *Tubergan v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 517 F.3d 470, 475 n. 4 (7th Cir. 2008) ("Under the ADEA, in the case of younger employees that fall above the age of forty, the age difference must be ten years or greater in order to be presumptively substantial.").

Johnson, however, cannot show that the AIC's legitimate, non-discriminatory reason for his discharge–his failure to fill out an incident report–was pretext for discrimination. Rather, Johnson agrees that he should have been disciplined; he just did not want to be discharged. That is a disagreement over a business decision, not evidence of pretext.

The AIC is entitled to judgment as a matter of law on Johnson's ADEA claim. Accordingly, the Court grants the AIC summary judgment as to Count IV.

### C. Conell's ADEA claim

In Count VIII, Conell asserts that she was discharged on the basis of her age in violation of the ADEA.

With respect to Count VIII, in order to make out a *prima facie* case of discrimination in the termination context, Conell must establish that (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she was discharged; and (4) the employer either filled the position with a person not in the plaintiff's protected class or a similarly-situated individual outside her protected class was treated more favorably. *Jennings v. Illinois Dep't of Corrections*, 496 F.3d 764, 767 (7th Cir. 2007); *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845-846 (7th Cir. 2007). Conell was over the age of forty at the time of her discharge, so she is in a protected class. The Court will assume she was otherwise performing her job satisfactorily. Conell was discharged. In addition, Conell was replaced by Todd Hengsteler, who, while also a member of Conell's protected class, at 44 is more than ten years younger than Conell. Accordingly, Conell has made out a *prima facie* case of discrimination. *Tubergan,* 517 F.3d at 475 n. 4.

Conell has not, however, put forth sufficient evidence to suggest that the AIC's legitimate reason (Conell's failure to answer a call from a guard) for terminating Conell's employment was pretext for age discrimination. Conell devotes three sentences in her brief to her pretext argument, and they boil down to: I should have been put on a performance improvement plan. That is an argument that AIC was sloppy with its personnel management, not an argument that it discriminated against her on the basis of her age. Sloppy personnel management does not violate the ADEA. A better argument might be that Nyepan also failed to

respond to the call, but he was not discharged. The flaw with that argument, however, is that Nyepan is just a few years younger than Conell. So, the fact that Nyepan was not punished does not suggest that Conell's discharge was related to age. At bottom, Conell admits that she failed to respond and merely disagrees that she should have been discharged for the failure. That is a dispute over a business decision, not pretext for age discrimination.

The AIC is entitled to judgment as a matter of law on Conell's age discrimination claim and is hereby granted summary judgment on Count VIII.

### D. Cahillane's ADEA claim

In Count VI, Cahillane asserts that he was discharged due to his age in violation of the ADEA.

Cahillane points to no direct evidence of age discrimination, so he follows the indirect method. Cahillane makes out a *prima facie* case of age discrimination. Cahillane is in the protected class, was (the Court assumes) meeting his employer's expectations, was discharged and was replaced by someone outside of his protected class.

The Art Institute has put forth evidence of a legitimate, non-discriminatory reason for Cahillane's termination: he failed to complete the guest count and instead left early. Like Conell, Cahillane argues that this is pretextual, because he was never put on a performance improvement plan. That, however, is merely a dispute about the best personnel management decisions, not evidence of pretext. What Cahillane needs to show is that Van Hook did not honestly believe that Cahillane had left early, thereby failing to ensure a proper count. The fact that Cahillane could not remember, at his deposition, whether or not he had left early on September 6, 2006 does not suggest Van Hook's belief that Cahillane left early was dishonest. Indeed, Cahillane believed Van Hook was genuinely upset with him. Cahillane has failed to put forth sufficient evidence from which a reasonable jury could conclude that AIC discharged him

due to his age.  The Art Institute is entitled to judgment as a matter of law on Cahillane's ADEA claim and is hereby granted summary judgment on Count VI.

## IV.  Conclusion

For the reasons set forth above, the Court grants the Art Institute's motions for summary judgment.  The Court grants summary judgment in favor of the Art Institute and against plaintiffs on Counts I, II, III, IV, V, VI, VII and VIII.

ENTER:

_____
George M. Marovich
United States District Judge

DATED:   October 21, 2009